[No. S180759. Feb. 22, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ALBERT TROYER, Defendant and Appellant.

600

COUNSEL

J. Wilder Lee, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Donald E. DeNicola, Deputy State Solicitor General, David A. Rhodes, Daniel B. Bernstein and Doris A. Calandra, Deputy Attorneys General, for Plaintiff and Respondent.

Law Offices of Ronald Richards & Associates, Ronald Richards, Nicholas Bravo and Patrick T. Santos as Amici Curiae.

OPINION

**BAXTER, J.**—"[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " (*Payton v. New York* (1980) 445 U.S. 573, 585 [63 L.Ed.2d 639, 100 S.Ct. 1371].) Thus, "searches and seizures inside a home without a warrant are presumptively unreasonable." (*Id.* at p. 586.) "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." (*Brigham City v. Stuart* (2006) 547 U.S. 398, 403 [164 L.Ed.2d 650, 126 S.Ct. 1943].) In particular, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." (*Ibid.*)

 In this case, both the trial court and the Court of Appeal found the record sufficient under the emergency aid exception to justify a warrantless entry by police into a residence to search for additional victims of a recent shooting. The Court of Appeal, however, reversed the judgment because it found the police erred in entering a locked upstairs bedroom, where marijuana, related paraphernalia, and firearms were found in plain view. Because the police did not need "ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception" to the warrant requirement in order to enter the bedroom but merely " 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger" (*Michigan v. Fisher* (2009) 558 U.S. ___, ___ [175 L.Ed.2d 410, 130 S.Ct. 546, 549] (*per curiam*)), we reverse the Court of Appeal.

## Background

This was the situation confronting Elk Grove Police Sergeant Tim Albright, a 15-year veteran, on June 6, 2007, according to the testimony elicited at the hearing on defendant's motion to suppress:

At 12:18 p.m., police dispatch broadcast a report of shots fired at 9253 Gem Crest Way in Elk Grove. An unidentified male had "possibly been shot twice," and the suspects were driving "a two-door Chevrolet product." Sergeant Albright, the first officer to respond, arrived at the scene at 12:20 p.m., but he was in plain clothes and an unmarked vehicle. The suspects' vehicle was nowhere in sight, so Albright approached the front porch of the residence, where a 40-year-old White male was administering first aid to a female victim (later identified as Mia Zapata) who had been shot multiple times. A Hispanic male, later identified as Adrien Abeyta, was also on the porch. He had a wound on the top of his head, and blood was streaming onto his face and T-shirt.

Zapata was in obvious distress and "an altered level of consciousness." She was not able to provide information to the officer. Albright turned to Abeyta to find out what had happened, but it was difficult to get information from him because he, too, was excited and agitated. Abeyta did say that two individuals were involved, a White male and a Black male, and that they had fled westbound in a blue or black two-door Chevrolet Tahoe.

Albright noticed there was blood on the front door—smudge marks and blood droplets in multiple areas, including "near the handle side of the door." This indicated to him that a bleeding victim had come into contact with that door "at some point," either by entering or exiting the house, so he asked Abeyta whether anyone was inside. Abeyta stared at the officer for 15 or 20 seconds but did not respond. When Albright repeated the question, Abeyta stared at him again but eventually said that he "did not think so." Needing clarification, Albright asked the question for a third time. Abeyta took a "long" pause to stare at the officer and then said "no."

The situation was "[v]ery chaotic." Zapata was screaming and asking for water over and over, and Albright was attempting to direct the citizen in providing first aid. Abeyta, too, was in an excitable state and was yelling and screaming for medical personnel. Sirens announced the arrival of both firetrucks and patrol vehicles. In the midst of this, Albright was concerned that Abeyta's eventual response that no one was inside the house was untruthful or, because of his head injury, inaccurate, and therefore was worried that there might be additional victims—or even additional suspects—inside. But the window blinds were closed, and, with all the noise, Albright

could not focus on whether there were any sounds coming from inside the residence. Under these circumstances, Albright decided that he had a responsibility to verify whether there were additional victims or suspects in the house.

Albright asked Abeyta whether the keys attached to a lanyard in his hand were to the residence and explained the urgency in locating potential victims or suspects inside. Abeyta replied that the keys were to the residence, but declined to give permission to enter the house. When Albright warned him that the officers would otherwise have to kick in the door, Abeyta unlocked it. After announcing their presence (and hearing no response), a team of uniformed peace officers entered the house to look for victims and suspects. After clearing the downstairs, the officers headed upstairs, continuing to look in places where a body could be.

Officer Samuel Seo approached a locked bedroom door. He announced his presence outside the door and, hearing no response, kicked the door open. Seo immediately smelled a strong odor of marijuana and observed an electronic scale and quarter-size balls of the drug. After verifying there was no one in the house, Seo relayed his observations to Detective Mark Bearor, who prepared an affidavit for a search warrant. The warranted search uncovered additional marijuana; a live marijuana plant; two semiautomatic pistols, a shotgun, a Winchester rifle, and ammunition; over $9,000 in cash; and indicia linking defendant Albert Troyer to the residence.

The parties stipulated that defendant, who was not home at the time of the search, had standing to challenge the police entry into and search of the residence. Following the hearing, the superior court denied the motion to suppress. Defendant then pleaded no contest to unlawful possession of marijuana for sale and unauthorized cultivation of marijuana, and admitted arming enhancements for both offenses. (Health & Saf. Code, §§ 11358, 11359; Pen. Code, § 12022, subd. (a)(1).) The court suspended imposition of sentence and placed defendant on probation for five years on the condition he serve one year in jail.

A divided panel of the Court of Appeal reversed and directed the trial court to enter an order granting the motion to suppress. The majority reasoned that although the emergency aid exception to the warrant requirement justified the initial entry into the residence, it did not justify entry into the locked upstairs bedroom because "there were insufficient facts for the officers to reasonably believe there was somebody inside the locked upstairs bedroom who was seriously injured or imminently threatened with such injury." The majority also found that the entry could not be justified as a protective sweep under *Maryland v. Buie* (1990) 494 U.S. 325 [108 L.Ed.2d 276, 110 S.Ct. 1093], in

that there were insufficient facts to justify a reasonable belief "there were dangerous people inside the house, let alone inside the locked upstairs bedroom." Justice Nicholson, dissenting, argued that the justification for the initial entry into the locked house under the emergency aid exception also justified entry into the locked bedroom and cautioned: "That, in hindsight, no other victim was found in the residence may make it more comfortable to find a violation of the Fourth Amendment, but it did not make the search less reasonable."

We granted the People's petition for review.

### DISCUSSION

■ In California, issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1156, fn. 8 [95 Cal.Rptr.3d 652, 209 P.3d 977].) Defendant contends that the police entry into his home was an unreasonable search under the Fourth Amendment. ■ Because a warrantless entry into a home is presumptively unreasonable, the government bears the burden of establishing that exigent circumstances or another exception to the warrant requirement justified the entry. (*Rogers*, at p. 1156.)

■ The parties agree that "police may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." (*Brigham City v. Stuart, supra*, 547 U.S. at p. 400.) " 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' " (*Mincey v. Arizona* (1978) 437 U.S. 385, 392 [57 L.Ed.2d 290, 98 S.Ct. 2408].) " ' "There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." ' " (*People v. Panah* (2005) 35 Cal.4th 395, 465 [25 Cal.Rptr.3d 672, 107 P.3d 790].) On appeal, we uphold the trial court's factual findings if they are supported by substantial evidence, but review independently its determination that the search did not violate the Fourth Amendment. (*People v. Rogers, supra*, 46 Cal.4th at p. 1157.)

■ The " 'emergency aid exception' " to the warrant requirement "does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." (*Michigan v. Fisher, supra*, 558 U.S. at p. ___ [130 S.Ct. at p. 548].) Rather, the exception "requires only 'an objectively reasonable basis for believing . . .' [citation] that 'a person within [the house] is in need of immediate aid.' " (*Ibid.*) "We are to approach

the Fourth Amendment . . . with at least some measure of pragmatism. If there is a grave public need for the police to take preventive action, the Constitution may impose limits, but it will not bar the way." (*Mora v. City of Gaithersburg* (4th Cir. 2008) 519 F.3d 216, 222.)

Defendant would impose one further requirement. In his view, the objectively reasonable basis for a warrantless entry under the emergency aid exception must be established by proof amounting to "probable cause," which is defined as " 'a reasonable ground for belief of guilt' " that is "particularized with respect to the person to be searched or seized." (*Maryland v. Pringle* (2003) 540 U.S. 366, 371 [157 L.Ed.2d 769, 124 S.Ct. 795].) Defendant cites no high court authority grafting such a standard onto the emergency aid exception. Nor does the importation of a concept governing police officers "engaged in the often competitive enterprise of ferreting out crime" (*Arizona v. Evans* (1995) 514 U.S. 1, 15 [131 L.Ed.2d 34, 115 S.Ct. 1185]) make sense under the emergency aid exception, where the police must make split second decisions as to whether someone is in need of immediate aid, not whether someone could be arrested for a crime (*People v. Ray* (1999) 21 Cal.4th 464, 475 [88 Cal.Rptr.2d 1, 981 P.2d 928] (lead opn. of Brown, J.) [finding the probable cause standard is "inappropriate" in assessing the police function of aiding persons in need of assistance]; accord, *Ortiz v. State* (Fla.Dist.Ct.App. 2009) 24 So.3d 596, 606 (conc. opn. of Torpy, J.) ["When a search is noncriminal in purpose, . . . criminal concepts are not helpful in making the determination of reasonableness."]; *State v. Carlson* (Iowa 1996) 548 N.W.2d 138, 142). As then Circuit Judge Warren Burger explained, "the business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." (*Wayne v. U.S.* (D.C. Cir. 1963) 115 U.S. App.D.C. 234 [318 F.2d 205, 212] (conc. opn. of Burger, J.), quoted in *Tamborino v. Superior Court* (1986) 41 Cal.3d 919, 924, fn. 2 [226 Cal.Rptr. 868, 719 P.2d 242].)

■ Thus, when we balance the nature of the intrusion on an individual's privacy against the promotion of legitimate governmental interests in order to determine the reasonableness of a search in the circumstances of an emergency (*Delaware v. Prouse* (1979) 440 U.S. 648, 654 [59 L.Ed.2d 660, 99 S.Ct. 1391]), we must be mindful of what is at stake. The possibility that immediate police action will prevent injury or death outweighs the affront to privacy when police enter the home under the reasonable but mistaken belief that an emergency exists. (*U.S. v. Snipe* (9th Cir. 2008) 515 F.3d 947, 954.) Indeed, the high court has already held that as to a " 'protective sweep' "—an analogous circumstance in which police search a residence to locate "anyone inside who might endanger their safety" (*People v. Celis* (2004) 33 Cal.4th

667, 671 [16 Cal.Rptr.3d 85, 93 P.3d 1027], citing *Maryland v. Buie, supra*, 494 U.S. 325)—"the probable cause standard did not apply." (*Celis*, at p. 677.)

█ Accordingly, some courts have held that any probable cause requirement is automatically satisfied whenever there is an objectively reasonable basis for believing that an occupant is in need of emergency aid. (E.g., *U.S. v. Snipe, supra*, 515 F.3d at p. 952; *U.S. v. Holloway* (11th Cir. 2002) 290 F.3d 1331, 1338; *Koch v. Brattleboro* (2d Cir. 2002) 287 F.3d 162, 169; *McNeil v. City of Easton* (E.D.Pa. 2010) 694 F.Supp.2d 375, 388–389; see also *State v. Meeks* (Tenn. 2008) 262 S.W.3d 710, 726, fn. 31.) Other courts have reasoned that the concept of probable cause simply has no role in the analysis of a warrantless entry into a residence under the emergency aid exception. (E.g., *Wofford v. State* (1997) 330 Ark. 8 [952 S.W.2d 646, 652]; *People v. Allison* (Colo. 2004) 86 P.3d 421, 427; *State v. Fausel* (2010) 295 Conn. 785 [993 A.2d 455, 461–462]; *State v. Carlson, supra*, 548 N.W.2d at p. 142; *State v. Alexander* (1998) 124 Md.App. 258 [721 A.2d 275, 286]; *Hannon v. State* (Nev. 2009) 207 P.3d 344, 346; *Duquette v. Godbout* (R.I. 1984) 471 A.2d 1359, 1362; *State v. Deneui* (2009) 2009 SD 99 [775 N.W.2d 221, 230]; *State v. Comer* (2002) 450 Utah Adv. 16 [51 P.3d 55, 62]; see also *Armijo v. Peterson* (10th Cir. 2010) 601 F.3d 1065, 1075; *U.S. v. Quezada* (8th Cir. 2006) 448 F.3d 1005, 1007.) We decline to resolve here what appears to be a debate over semantics. Under either approach, and in light of the fact that "the ultimate touchstone of the Fourth Amendment is 'reasonableness,' " our task is to determine whether there was an objectively reasonable basis for believing that an occupant was seriously injured or threatened with such injury. (*Brigham City v. Stuart, supra*, 547 U.S. at p. 403; cf. *Graham v. Connor* (1989) 490 U.S. 386, 397 [104 L.Ed.2d 443, 109 S.Ct. 1865] [claim of excessive force depends on "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them"]; *People v. Jenkins* (2000) 22 Cal.4th 900, 974 [95 Cal.Rptr.2d 377, 997 P.2d 1044] [where the state seeks to justify a warrantless search by relying upon the consent of a third party, "the state may carry its burden by demonstrating that it was objectively reasonable for the searching officer to believe that the person giving consent had authority to do so . . ."].)

The record amply supported an objectively reasonable belief that one or more shooting victims could be inside the house. Police dispatch stated that shots had just been fired "at" 9253 Gem Crest Way, and, indeed, Sergeant Albright's observations of the blood at the scene indicated that a shooting had occurred "mere feet [from] or within the doorway area." Bloodstains on the door signaled that a bleeding victim had come into contact with the door, either by entering or by exiting the residence. (See *People v. Rodriguez* (N.Y.App.Div. 2010) 77 A.D.3d 280 [907 N.Y.S.2d 294, 301] [blood on the

landing in front of the apartment and on the door constituted "some reasonable basis . . . to associate the emergency with the inside of apartment 3L"].)

Moreover, the original dispatch report stated that a male victim had "possibly been shot twice"—and no such victim had yet been located. Sergeant Albright harbored "concern" about Abeyta, who had suffered a head injury and was bleeding, but the officer never stated that he observed any gunshot wounds on Abeyta or that he had concluded Abeyta must have been the man described in the dispatch report. In any event, a concern that Abeyta might have suffered a gunshot wound did not foreclose the reasonable possibility that the male victim described in the original dispatch was still at large. (*Causey v. City of Bay City* (6th Cir. 2006) 442 F.3d 524, 530 [despite the plaintiffs' assurances that no one was injured, it was " 'equally plausible and not unreasonable' " for the officers to infer that the plaintiffs were concealing an injured victim or were being intimidated by an unseen attacker]; *U.S. v. Leveringston* (8th Cir. 2005) 397 F.3d 1112, 1117 [noting that while blood on the defendant's shirt could have been his own, a reasonable officer could also have inferred that another party had been injured after some sort of struggle with the defendant]; see generally *Michigan v. Fisher, supra,* 558 U.S. at p. ___ [130 S.Ct. at p. 549] ["the test, as we have said, is not what [the officer] believed, but whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger . . ."].)

Sergeant Albright asked Abeyta whether there was anyone inside the residence, but Abeyta's inconsistent answers raised serious concerns about his ability to give accurate and reliable responses. (*People v. Poulson* (1998) 69 Cal.App.4th Supp. 1, 6 [82 Cal.Rptr.2d 605]; *State v. Carlson, supra,* 548 N.W.2d at p. 143 ["The situation clearly remained sufficiently ambiguous to warrant further inquiry."]; *State v. Frankel* (2004) 179 N.J. 586 [847 A.2d 561, 574] ["The responding police officer is not required to accept blindly the explanation for the 9-1-1 call offered by the resident answering the door . . ."]; *People v. Rodriguez, supra,* 907 N.Y.S.2d at pp. 298–299; see generally *U.S. v. Russell* (9th Cir. 2006) 436 F.3d 1086, 1090 ["Given the substantial confusion and conflicting information, the police were justified in searching the house in order to determine whether there were other injured persons . . ."].) The first time Albright asked whether anyone was inside the house, Abeyta just stared at Albright for 15 to 20 seconds and failed to respond. The second time, Abeyta continued to stare at the officer and eventually said he "did not think so." The third time, Abeyta paused for a "long" time, stared at the officer, and then said "no." Because the window blinds were closed, Albright could not peek inside to verify whether Abeyta's final answer was the correct one, nor, given the chaos at the scene, could he hear whether any sounds were coming from inside the residence. Under these circumstances, and inasmuch as Albright did not know who lived at the

residence or who had been the aggressor, an objectively reasonable basis existed to enter the residence to search for additional victims.

The police entry here was no less justifiable than the police reentry into the apartment in *Tamborino v. Superior Court, supra,* 41 Cal.3d 919 (*Tamborino*). In *Tamborino,* police responded to a reported robbery at a particular address, and a neighbor confirmed that an injured person was inside the apartment. After receiving no response to his loud knock and announcement of his presence, the officer kicked in the door and found Tamborino, who seemed to be bleeding from the right side of his face, with "quite a bit of blood on his head, neck and hands." (*Id.* at p. 922.) The officer, unsure whether Tamborino was a suspect or a victim, brought Tamborino out of the apartment and handcuffed him. The officer immediately reentered the apartment, based on his concern that there might be other injured persons inside, without even asking Tamborino whether anyone else was there. As he walked through the apartment, the officer found cocaine residue, marijuana, and some narcotics paraphernalia in plain view. (*Ibid.*)

In rejecting a challenge to the officer's reentry into the apartment, we explained that "the observation of Tamborino, wounded and bleeding, coupled with the earlier report of a robbery, constituted 'articulable facts' that reasonably could have led the officer to decide that an immediate, brief search of the apartment was warranted to determine whether additional persons were present at the crime scene. Officer Klein had no prior information indicating that only *one* victim was involved in the robbery, and in light of the situation he confronted, ordinary, routine common sense and a reasonable concern for human life justified him in conducting a walk-through search truly limited in scope to determining the presence of other victims." (*Tamborino, supra,* 41 Cal.3d at p. 923.) Invoking the general rule set forth in *Mincey v. Arizona, supra,* 437 U.S. at page 392, that " 'when the police come upon the scene of a homicide they may make a prompt warrantless search of the area *to see if there are other victims* or if a killer is still on the premises,' " we concluded that "comparable principles would govern a search of the scene of a robbery involving a wounded victim" and, thus, that "the discovery of one wounded victim afforded reasonable cause to enter and briefly search for additional victims" in that case. (*Tamborino, supra,* 41 Cal.3d at p. 924; see *People v. Hill* (1974) 12 Cal.3d 731, 755 [117 Cal.Rptr. 393, 528 P.2d 1] ["Although only one casualty had thus far been reported, others may have been injured and may have been abandoned on the premises"; therefore, "it was reasonable for the officers to believe that the shooting may have resulted in other casualties in addition to that reported to the police and that an immediate entry was necessary to render aid to anyone in distress."], overruled on other grounds in *People v. DeVaughn* (1977) 18 Cal.3d 889, 896, fn. 5 [135 Cal.Rptr. 786, 558 P.2d 872]; see generally 3 LaFave, Search and Seizure

(4th ed. 2004) § 6.6(a), p. 457 ["courts have upheld entry to search for possible victims in premises where shots have been fired"].)

The out-of-state cases on which defendant relies, which rejected application of the emergency aid exception in the particular circumstances presented, are distinguishable and, in any event, not binding on us.

In *Hannon v. State, supra*, 207 P.3d 344, police responded to a neighbor's call reporting a possible domestic disturbance 45 minutes after the argument had ended. When police arrived at the "quiet apartment" (*id.* at p. 348), the girlfriend was "red-faced, crying, and breathing hard," and the boyfriend "appeared to be flushed and 'angry.' " Both parties stated that they were unharmed and that nobody else was there. Although the officer was twice denied entry, he nonetheless pushed his way in and discovered marijuana and assorted paraphernalia in the living room and kitchen. At the hearing on the motion to suppress, the officer "admitted that '[he] didn't have evidence' that another occupant may have been inside who needed emergency assistance, he 'just had suspicions.' " (*Id.* at p. 345.) In reversing the denial of the motion to suppress, the Supreme Court of Nevada emphasized that the possible domestic disturbance "seemed to have already dissipated," there was "no apparent need for swift action," neither occupant "exhibited observable signs of injury," and the officer "had even less reason to believe that Hannon's apartment may have harbored an unidentified third person in need of emergency assistance." (*Id.* at pp. 347–348.) Here, by contrast, the police arrived minutes after a reported shooting to find one victim with gunshot wounds, another bleeding heavily from a head wound, blood on the door indicating an injured victim had entered or exited the residence, a report of a male shooting victim at that address who may still have been unaccounted for, and evasive or unreliable responses from Abeyta as to whether anyone inside needed assistance.

Defendant relies also on *People v. Allison, supra*, 86 P.3d 421 (*Allison*), which interpreted the emergency aid exception to the Fourth Amendment to require that "[t]he officer's primary purpose must be to render emergency assistance, not to search for evidence" (*Allison, supra*, at p. 426) and which upheld the trial court's suppression order on the ground that the officer's reentry into the residence was motivated by a desire "to conduct a criminal investigation, not to render emergency assistance." (*Id.* at p. 428.) The high court, however, has since rejected any inquiry into an officer's subjective motivation. (*Brigham City v. Stuart, supra*, 547 U.S. at pp. 404–405.)

We find, moreover, that *Allison* tends to support the police entry here. When the officer arrived at the residence after a 911 hang-up call, Mrs. Allison came to the door nervous, out of breath, and with blood on or around her

nose. She claimed she had had an accident but was " 'okay' " and denied that anyone else was in the house, even though she continuously glanced over her shoulder to look back inside the home, and denied having been in an altercation. Eventually, Mrs. Allison admitted "that she was in a fight with her husband" (*Allison, supra*, 86 P.3d at p. 423) but repeated that no one was inside. After a long discussion, Mrs. Allison let the officer come inside. All parties agreed with the trial court that this initial entry was justified by consent or the emergency aid exception. (*Ibid.*) Similarly, here, the report of a shooting at this address, the presence of at least one shooting victim, and Abeyta's inconsistent and unreliable responses as to the existence of additional victims inside the house justified the entry into the residence.

In *Allison*, only the second and third entries into the house, once Mr. Allison (who had a swollen and bloody lip) and his wife had been removed from the residence, were deemed improper, inasmuch as the police saw "no evidence that a violent incident potentially endangering third persons had occurred." (*Allison, supra*, 86 P.3d at p. 429.) Mr. Allison's mere uncertainty as to whether a man who lived upstairs was at home at the time was not sufficient to create an emergency; "[w]hile domestic disputes can involve third parties and present a danger to children, the police here had no indication that children were involved or that any third party might have participated in the dispute and needed emergency assistance." (*Id.* at p. 427.) In this case, on the other hand, the nature of the crime, the presence of blood on the door, the unaccounted-for male shooting victim, and Abeyta's conflicting and unreliable answers about additional victims constituted specific and articulable facts that reasonably could have led the officer to believe someone inside "might need help." (*Brigham City v. Stuart, supra*, 547 U.S. at p. 406; see also *Moulton v. State* (2006) 2006 WY 152 [148 P.3d 38, 45–46] [distinguishing *Allison*]; *People v. Souva* (Colo.Ct.App. 2005 ) 141 P.3d 845, 849 [same].)

The Court of Appeal below agreed that the entry into the residence was justified, but the panel majority concluded that the scope of the search (i.e., the entry into the locked upstairs bedroom) was not. The majority reasoned that "[o]nce the officers entered, . . . they did not see anything that attracted their attention. It did not appear any struggle had taken place in the house, and they did not see any blood, even though they were looking for it. . . . Although the facts known to the officers justified the initial entry into the house, and assuming for the sake of argument that they justified a search of the upper floor as well as the lower floor (despite the lack of any blood except on the front door), the facts known to the officers did *not* justify kicking in the locked door to an upstairs bedroom to look for additional victims because the facts did not support an objectively reasonable belief that there was a person within the locked bedroom who was in need of immediate aid."

We disagree and find that the scope of the search was reasonable. The scope of a warrantless search "must be 'strictly circumscribed by the exigencies which justify its initiation.' " (*Mincey v. Arizona, supra*, 437 U.S. at p. 393.) Here, the same facts that justified entry into the residence justified a search of places where a victim could be, which included the upstairs bedroom. The male shooting victim, who reportedly had been shot twice at this address, was apparently unaccounted for—although it was unlikely that he would have gone far. Moreover, there was blood on the front door, indicating an injured victim had come in contact with it while entering or exiting the residence. Officer Seo's testimony that he did not see any blood on the first floor of the residence did not negate the objectively reasonable belief that a victim might still have been inside the house. (Cf. *Michigan v. Fisher, supra*, 558 U.S. at p. ___ [130 S.Ct. at p. 549] [although the police could not see anyone else inside the residence, "[i]t would be objectively reasonable to believe that Fisher's projectiles might have a human target . . ."].) Seo admitted that he and the other officers were performing only a "glancing, cursory[-]type" search for blood, given that their attention was focused on discovering "a body that's lying on the floor or someone who's injured." A walk-through search "truly limited in scope," of course, was proper under the circumstances (*Tamborino, supra*, 41 Cal.3d at p. 923), but it does not establish that there was no blood inside the residence. Even if there were no blood at all, it would have signaled only that the injured victim did not come in direct contact with anything on the first floor.

Bloodstains, in any event, "are not prerequisites to a finding of exigency." (*Schreiber v. Moe* (6th Cir. 2010) 596 F.3d 323, 331.)

Nor are signs of a struggle in the interior of a residence. When one party is armed and the other is not, for example, it would not be surprising to find the unarmed party choosing cooperation over confrontation. Here, there were two male suspects, which offered the possibility that one intruder could have held the downstairs victims at bay while the other suspect "cased" the upstairs.

*Hunsberger v. Wood* (4th Cir. 2009) 570 F.3d 546 is instructive. There, the Fourth Circuit held it was reasonable for the officer (Wood) to enter a home to protect against vandalism and to locate a missing girl. (*Id.* at p. 555.) Hunsberger, like defendant here, argued that the scope of the search was unreasonable, in that once Wood found no evidence of vandalism on the first floor, he should not have descended to the basement or gone up to the second floor. The court found this argument was "without merit. The fact that there was no evidence of vandalism in the main living area did not require the conclusion that all was well in the Hunsberger house. Vandals do not confine their search for valuables to downstairs rooms, nor do they rule the upstairs out of bounds for hiding or for inflicting serious harm on others they may happen upon in a house. It is not surprising, therefore, that plaintiffs do not point to precedent for the proposition they seek." (*Id.* at p. 556.) There is

likewise no reason to believe that the violent criminals who perpetrated the shooting here would have ruled the upstairs out of bounds.

The possibility that the unaccounted-for male victim (or other victims) could have been in the locked upstairs bedroom was further enhanced by Abeyta's inconsistent and evasive responses to Sergeant Albright's inquiries as to whether anyone was inside the residence. A "hindsight determination that there was in fact no emergency" does not rebut the objectively reasonable basis for believing that someone in the house was injured or in danger. (*Michigan v. Fisher, supra*, 558 U.S. at p. ___ [130 S.Ct. at p. 549].) In addition, the locked door posed obvious risks to the officers as they continued their search upstairs, inasmuch as the risk of danger to an officer conducting a search of a residence is "as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter." (*Maryland v. Buie, supra*, 494 U.S. at p. 333.) "It does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation like the one they encountered here." (*Michigan v. Fisher, supra*, 558 U.S. at p. ___ [130 S.Ct. at p. 549]; see generally 3 LaFave, Search and Seizure, *supra*, § 6.6(a), p. 453 ["the question is whether 'the officers would have been derelict in their duty had they acted otherwise' "].)

■ The dissenting opinion characterizes the situation confronting the officers somewhat differently. In the view of the dissent, it was a "logical and reasonable inference" that the report of an unidentified male who had " 'possibly been shot twice' " was "mistaken about the gunshot victim's gender" (dis. opn., *post*, at p. 617), that the "likely source" of the blood on the door was Abeyta himself (*id.* at p. 618), and that Abeyta's difficulties in responding to the question whether anyone was inside may have been attributable to Abeyta's head wound, the noisy and chaotic scene, and Abeyta's puzzlement over "the point of [the officer's] question." (*Id.* at p. 618.) We need not quarrel over whether these particular inferences were reasonable. The People's burden under the Fourth Amendment is to identify *an* objectively reasonable basis for believing that someone inside was in need of immediate aid—not to eliminate every other reasonable inference that might also have been supported by those facts. (See *State v. Mielke* (2002) 257 Wis.2d 876 [653 N.W.2d 316, 319] ["When a police officer is confronted with two reasonable competing inferences, one that would justify the search and another that would not, the officer is entitled to rely on the reasonable inference justifying the search."].) Moreover, on appeal from the denial of a motion to suppress, we are bound by the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility, including Sergeant Albright's testimony that Abeyta seemed either untruthful or inaccurate, where (as here) the findings are supported by substantial evidence. (*People v. Zamudio* (2008) 43 Cal.4th 327, 342 [75 Cal.Rptr.3d 289, 181 P.3d 105].) The narrative set forth by the dissent thus did not foreclose Sergeant

Albright from reasonably inferring—or the trial court from impliedly finding—that an unaccounted-for male victim may have smeared blood on the door in entering the residence, or that Abeyta's evasive responses, whether attributable to his gunshot injury, the chaotic circumstances at the scene, or other (more sinister) reasons, were unreliable.

Finally, we find that the manner of the police entry was reasonable. (*Brigham City v. Stuart, supra*, 547 U.S. at pp. 406–407.) Once Abeyta opened the door, the officers announced their presence and "called for anybody in the house." Hearing no answer, the officers entered the residence and searched the downstairs "where a body . . . could be lying." After "clearing" the downstairs, the officers headed upstairs. Officer Seo found the door to the master bedroom was locked. Seo knocked on the door and announced his presence but heard no response. Only then did he kick the door open and find the marijuana and assorted paraphernalia in plain view. As the dissenting justice pointed out below, this was not a violation of the Fourth Amendment; it was "a reasonable and brave execution of law enforcement duties."

## DISPOSITION

The judgment of the Court of Appeal is reversed.

Chin, J., Corrigan J., and George, J.,* concurred.

**WERDEGAR, J.,** Concurring.—I agree with the majority that the officers' warrantless search was, under the circumstances, within the scope of discretionary judgment our society expects police officers to exercise in an emergency or possible emergency. I particularly agree that the locked bedroom door presented the officers with "obvious risks" to their own safety, risks they could reasonably decide were too great to ignore. (Maj. opn., *ante*, at p. 613.) Reliance on this circumstance does not fit comfortably within the emergency aid doctrine, as it raises a threat to officer safety rather than grounds for believing another person is in need of assistance. Nor does it squarely come within the "protective sweep" doctrine of *Maryland v. Buie* (1990) 494 U.S. 325 [108 L.Ed.2d 276, 110 S.Ct. 1093], as the search here did not accompany an arrest. Nonetheless, to ignore the potential risk is difficult or impossible. We cannot reasonably demand that officers called to the scene of a shooting, where they cannot be sure of the number or whereabouts of the armed assailants, proceed to assist victims and investigate the crime scene without securing themselves, witnesses, and others present against ambush from a nearby hiding place.

---

*Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

I reach this conclusion reluctantly because the warrantless search of a home invades an interest at the heart of the Fourth Amendment's protections and may be justified only by the most compelling considerations. In the circumstances of the present case, the need to secure the somewhat chaotic scene of a shooting provided that justification.

**KENNARD, Acting C. J.,** Dissenting.—The majority holds that when the police officers here broke open the locked door to defendant's bedroom, they acted lawfully, without violating the federal Constitution's Fourth Amendment, which prohibits unreasonable searches and seizures. I disagree.

I recognize the practical realities that police officers face when, as happened here, they are called to the scene of a shooting or other criminal violence. In a highly stressful situation, they must quickly make decisions with potentially life-or-death consequences, knowing that after-the-fact criticism may arise no matter what they do. The issue here, however, is controlled by the United States Supreme Court's decisions construing the federal Constitution's Fourth Amendment. (See *Gates v. Discovery Communications, Inc.* (2004) 34 Cal.4th 679, 692 [21 Cal.Rptr.3d 663, 101 P.3d 552] [on issues of federal constitutional law, U.S. Supreme Court decisions are controlling]; *People v. Lenart* (2004) 32 Cal.4th 1107, 1118 [12 Cal.Rptr.3d 592, 88 P.3d 498] [in Cal. criminal proceedings, federal constitutional law governs issues related to the suppression of evidence derived from police searches and seizures].) Applying those decisions to the facts here, I conclude that the officers' challenged conduct was unlawful.

To determine whether police officers acted lawfully in conducting a search or seizure, the first step is to consider the facts known to the officers at the time of their challenged actions, as shown by the evidence presented at the trial court's hearing on the defendant's motion to suppress evidence. Here, after receiving a 911 emergency call, a police radio dispatcher sent out a message that a shooting had been reported at a particular address in a residential neighborhood, that an unidentified male had "possibly been shot twice," and that the suspects' vehicle was "a two-door Chevrolet product."

Police Sergeant Tim Albright was the first officer to arrive at the scene. On the front porch of a two-story house, he saw a man, later identified as a neighbor, giving first aid to a woman, later identified as Mia Zapata, who had been shot multiple times. On the house's front door were blood smears and droplets. Moving back and forth on the front porch was another man, later identified as Adrien Abeyta. He had a wound on the top of his head, from which blood streamed down the back of his head. Blood covered most of his face and also his T-shirt.

Although agitated and excited, Abeyta gave Sergeant Albright a description of the persons responsible for his injury and Zapata's: A White male and a Black male who had driven away westbound in a blue or black two-door Chevrolet Tahoe. While he was talking to Abeyta, Albright was also giving first aid instructions to the neighbor who was helping Mia Zapata. Albright could not see into the house, because the blinds were drawn. He heard no sounds coming from inside. He saw no signs of forced entry, nor did he see bullet holes in the windows. In response to Sergeant Albright's inquiry, Abeyta said there was no one inside the house.

Abeyta refused Sergeant Albright's request for permission to enter the house, but he unlocked the front door when Albright threatened to force it open. At Albright's direction, four officers entered the house to search for other victims or suspects. Inside, the officers saw no signs of a struggle and no blood smears or droplets; they did not see or hear anything indicating that someone was inside. On the second floor, they found that the door to one of the bedrooms, later identified as defendant's, was locked. They knocked and announced their presence. They heard no sound coming from within the bedroom. The officers then forced open the bedroom door. There was no one inside.

These facts known to the officers must be considered in light of the controlling law. The federal Constitution's Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . ." As the high court has observed, forced entry into a person's home, without adequate justification, is "the chief evil against which the wording of the Fourth Amendment is directed." (*United States v. United States District Court* (1972) 407 U.S. 297, 313 [32 L.Ed.2d 752, 92 S.Ct. 2125].) To guard against that evil, police officers are normally required to obtain a search warrant before they may forcibly enter a home, so that forced entry without such a warrant is presumptively unreasonable. (*Groh v. Ramirez* (2004) 540 U.S. 551, 559 [157 L.Ed.2d 1068, 124 S.Ct. 1284].) An exception to this warrant requirement applies when the circumstances indicate that entry is necessary to " 'protect and preserve life or avoid serious injury.' " (*Mincey v. Arizona* (1978) 437 U.S. 385, 392 [57 L.Ed.2d 290, 98 S.Ct. 2408].) More precisely, the United States Supreme Court has recently held that this exception, known as the emergency doctrine, applies when the officers have "an objectively reasonable basis for believing" that someone inside needs immediate aid. (*Brigham City v. Stuart* (2006) 547 U.S. 398, 400 [164 L.Ed.2d 650, 126 S.Ct. 1943]; accord, *Michigan v. Fisher* (2009) 558 U.S. ___, ___ [175 L.Ed.2d 410, 130 S.Ct. 546, 548] (*per curiam*).)

Applying the law to the facts is the final step in determining the lawfulness of the police conduct at issue. When the officers broke into defendant's

locked upstairs bedroom, did they have an objectively reasonable basis for believing that someone needing immediate aid was inside that room? No, they did not.

The officers had not seen or heard anyone inside the bedroom or even inside the house. Abeyta, a resident of the house, had told Sergeant Albright that no one was inside. No one said otherwise. Inside the house, the officers saw no trace of blood and no sign of any violent activity, and they neither saw nor heard anything indicating that anyone was present. The officers' observations at the scene indicated that all the violence had occurred outdoors, and nothing they observed at the scene suggested the presence of any victims other than Abeyta and Zapata.

To establish the required objectively reasonable basis for believing that a person needing immediate aid was inside defendant's locked upstairs bedroom, the majority relies on three circumstances: (1) The radio dispatch call had mentioned a male gunshot victim, and no such victim had been located (maj. opn., *ante*, at p. 608); (2) Abeyta's responses, when asked whether someone was inside, were "inconsistent" (*ibid.*); and (3) the residence's front door had blood smears and droplets (*id.* at p. 607). As I explain, this reasoning is unpersuasive.

Sergeant Albright and the other officers at the scene did not know the source of the information in the radio dispatch message, which said that shots had been fired, that an unidentified male had "possibly been shot twice," and that the suspects were driving a "Chevrolet product." The officers could reasonably assume that the source was someone who had telephoned the police, but whether that person was an eyewitness to the events described, or merely someone relaying information provided by a third person, was something the officers did not know. On the front lawn, Sergeant Albright saw a person with multiple gunshot wounds, thereby confirming that shots had been fired and that someone had been hit. But the observed victim was a woman (Mia Zapata), not a man. The dispatcher had not mentioned a female victim or multiple victims. Under these circumstances, the logical and reasonable inference was that the unknown person who was the source of the dispatcher's information had been mistaken about the gunshot victim's gender. The dispatcher had used the word "possibly" in describing the shooting victim, and had said that the gunshot victim was "unidentified," thus indicating grounds for doubt about the reliability of this aspect of the message.

At the scene, Sergeant Albright did not see or hear anything to suggest there was a male gunshot victim who had not yet been located, nor did he ask anyone there whether such a victim existed. The majority asserts that the

blood smears and droplets on the residence's front door were indications that a bleeding victim had entered or exited the residence. But the likely source of that blood was Abeyta, who was bleeding profusely from head wounds, and who was (as Sergeant Albright testified at the hearing on the motion to suppress) "moving back and forth on a small concrete porch area that was approximately ten feet by four feet."

In any event, the issue is not whether entry into the *house* was justified by the possibility that there was an additional gunshot victim who had not been located. Rather, the issue is whether there was "an objectively reasonable basis" (*Brigham City v. Stuart, supra,* 547 U.S. 398, 400) to believe that such a victim was inside the *locked upstairs bedroom.* Because the police found no trace of blood inside the house, observed no sign of disturbance or struggle, and heard no sounds coming from inside the bedroom after knocking and announcing their presence, the possibility that a wounded gunshot victim was inside that room was too remote and speculative to justify the forced entry into the bedroom.

Unlike the majority, I perceive nothing inconsistent or suspicious in Abeyta's responses when Sergeant Albright asked him whether there was someone inside the residence. When Albright first posed this question, Abeyta stared at Albright for 15 to 20 seconds without responding. Albright repeated the question, and Abeyta answered that he did not believe that there was anybody inside. To clarify, Albright asked the same question yet again, to which Abeyta answered "no."

The two responses that Abeyta gave to Sergeant Albright's question were entirely consistent. The second response, a simple "no," confirmed his earlier response that he did not think anyone was inside. Although Abeyta was slow in responding, this hardly seems surprising or suspicious under the circumstances. First, Abeyta was agitated and excited, and he was bleeding profusely from a head wound, which may have compromised his ability to concentrate. Second, Abeyta may well have been taken aback by the question, inasmuch as the shooting had occurred outdoors and Abeyta had already told Sergeant Albright that the perpetrators had driven away in a Chevrolet Tahoe. Notably, Albright did not ask whether there were any victims other than Abeyta and Zapata, nor did he ask whether an *injured* person was inside the house. Abeyta may have hesitated in responding because he was trying to figure out the point of Albright's question. Third and finally, the scene was noisy and chaotic. Emergency vehicles with sirens were arriving, while Zapata was screaming and asking for water. Abeyta may have experienced some difficulty hearing and understanding Albright's question, he may have been waiting for other noises to subside before responding, or he may have been distracted by the scene unfolding around him.

For all these reasons, I find nothing sinister or evasive in Abeyta's brief pauses before answering Albright's question asking whether anyone was inside the house. Moreover, even if Sergeant Albright had legitimate reasons to doubt the reliability of Abeyta's responses, those doubts at most are grounds for disregarding Abeyta's responses; they did not provide "an objectively reasonable basis" (*Brigham City v. Stuart, supra*, 547 U.S. 398, 400) for believing that someone in need of immediate aid *was* inside the house, much less inside the locked upstairs bedroom.

Considering all the facts known to Sergeant Albright and the other officers present at the scene, I conclude, as did the Court of Appeal majority, that those officers lacked an objectively reasonable basis to believe that inside defendant's locked upstairs bedroom was a person needing immediate assistance. Consequently, the forcible warrantless entry into that bedroom was unlawful under the federal Constitution's Fourth Amendment, as interpreted by the United States Supreme Court in *Michigan v. Fisher, supra*, 558 U.S. ___ [130 S.Ct. 546], and *Brigham City v. Stuart, supra*, 547 U.S. 398. Therefore, the trial court should have granted defendant's motion to suppress the evidence obtained as a result of that unlawful entry.

I would affirm the judgment of the Court of Appeal.

Moreno, J., concurred.