Filed 4/11/16  P. v. Gellock CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>EDWARD CHARLES GELLOCK,<br><br>        Defendant and Appellant. | C071929<br><br>(Super. Ct. No. 11F02963) |

Convicted of rapes and other crimes and sentenced to an indeterminate term of 200 years to life under the Three Strikes law, defendant Edward Charles Gellock appeals. He contends:  (1) an officer's warrantless entry into defendant's apartment after he threatened suicide violated his Fourth Amendment rights and (2) his later consent to a search of the apartment was involuntary.  Neither contention has merit.  We therefore affirm.

1

BACKGROUND

Defendant's appellate contentions do not relate to the facts about his crimes, so we offer only a brief summary.

During the night of April 1, 2011, through the next morning, defendant invited V.W. to his apartment where he sexually assaulted her over an extended time. At least once, defendant, who uses a wheelchair and has trouble breathing, had to get up and go to a respirator for oxygen.

Three weeks later, on April 23, 2011, N.L., who was defendant's caregiver, accepted defendant's invitation to sleep at his apartment because she was too drunk to walk home. She went to sleep, but woke up as defendant was forcibly removing her clothing. He sexually assaulted her over an extended time.

Concerning the crimes against V.W., a jury convicted defendant of digital penetration (Pen. Code, § 289, subd. (a)(1)) and assault with intent to commit rape (Pen. Code, § 220).

Concerning the crimes against N.L., a jury convicted defendant of rape (Pen. Code, § 261, subd. (a)(2)), digital penetration (Pen. Code, § 289, subd. (a)(1) [two counts]), oral copulation (Pen. Code, § 288a, subd. (c)(2) [two counts]), and assault with intent to commit rape (Pen. Code, § 220).

The trial court found true the allegation that defendant had four prior serious felony convictions. Based on the Three Strikes law, the court sentenced defendant to eight consecutive indeterminate terms of 25 years to life.

DISCUSSION

I

*Entry into Defendant's Apartment*

Defendant contends that the warrantless entry into his apartment after he threatened suicide violated his Fourth Amendment rights. The contention is without

2

merit because the officer acted reasonably under the emergency aid exception to the warrant requirement.

A.       *Relevant Law*

"The Fourth Amendment to the federal Constitution guarantees against unreasonable searches and seizures by law enforcement and other government officials." (*People v. Rogers* (2009) 46 Cal.4th 1136, 1156, fn. omitted.)  "Thus, 'searches and seizures inside a home without a warrant are presumptively unreasonable.'  [Citation.] 'Nevertheless, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions.'  [Citation.]" (*People v. Troyer* (2011) 51 Cal.4th 599, 602 (*Troyer*).)

"One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury.  ' "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal about an exigency or emergency." '  [Citations.]  Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.  [Citations.]" (*Brigham City v. Stuart* (2006) 547 U.S. 398, 403 [164 L.Ed.2d 650, 657-658].)

" ' " 'There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.' " '  [Citation.]" (*Troyer, supra*, 51 Cal.4th at p. 606.)  "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.' [Citation.]" (*Brigham City v. Stuart, supra*, 547 U.S. at p. 404, italics omitted.)  "[T]he police did not need 'ironclad proof of "a likely serious, life-threatening" injury to invoke the emergency aid exception' to the warrant requirement in order to enter the [dwelling] but merely ' "an objectively reasonable basis for believing" that medical assistance was needed, or persons were in danger.' " (*Troyer, supra*, at p. 602.)

3

When we review a trial court's ruling on a motion to suppress, "[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.) Since the facts related to the entry of defendant's apartment are essentially undisputed, we independently review the application of law to the facts.

      B.     *Facts from the Suppression Hearing*

Since the trial court's ruling on defendant's motion to suppress was based on the evidence introduced at the suppression hearing, we limit our appellate consideration of the trial court's order to that evidence. (*People v. Fiscalini* (1991) 228 Cal.App.3d 1639, 1644, fn. 5.)

Officer Ethan Zeek of the Sacramento Police Department arrested defendant on April 2, 2011, for the rape of V.W. About three weeks later, on April 23, Officer Zeek was present during police contact with N.L., who had been raped that day by defendant. During the conversation, N.L. said that she had told defendant that she did not want to live. Defendant responded: "I can't live with myself after what I've done." After this statement, he threatened to kill both of them by blowing them up with his oxygen tanks.

N.L. left defendant's apartment earlier on the day she was interviewed in Officer Zeek's presence, but the record is unclear as to what time she left defendant's apartment. In any event, at the time Officer Zeek eventually entered defendant's apartment, he was unsure what time N.L. left the apartment but he knew she traveled from defendant's apartment to the location where Officer Zeek and other officers met her, a distance of about two and a half miles.

Officer Zeek knew where defendant lived because he had been there previously in connection with the V.W. rape, and he knew that defendant had oxygen tanks in the studio apartment. Based on N.L.'s comment about blowing them up with his oxygen tanks, Officer Zeek (about 3:30 p.m.) went to defendant's apartment. Officer Zeek's

purposes in going to defendant's apartment were to take a statement and, in Officer Zeek's words, "mainly to check on his welfare . . . [b]ecause he had stated that he did not want to live with himself."

Officer Zeek knocked on the door and loudly identified himself, but did not receive any response. He knocked first with his knuckles for two or three minutes, then with his metal baton for a total of about 10 minutes of knocking. He also knocked on neighbors' doors and asked whether they had seen defendant. Neighbors reported that he was normally home during the day.

Officer Zeek notified his superior of the statements that defendant made to N.L. about not wanting to live and that the neighbors said defendant should be in the apartment. Officer Zeek also contacted the maintenance man, who was in Oakland, to try to gain access to the apartment, to no avail. The maintenance man said he would send someone else to help get in the apartment, but that person did not appear.

Officer Zeek continued to call out to defendant through the door. Officer Tony Yager arrived at the apartment and eventually was able to pick the lock to open the door. Officer Zeek had not heard any sounds from inside and believed by then that he would find a dead body inside.

Once the door was open (about 4:25 p.m.), Officer Zeek stepped into the apartment and immediately saw defendant sitting with his right hand on the valve of the oxygen tank and his left hand below the valve holding a lighter. Defendant said, "I'll do it." Officer Zeek responded, "Ed [referring to defendant], drop the lighter. You don't want to do that." Officer Yager stepped into the apartment next, drew his firearm, and pointed it at defendant. Officer Yager also placed his foot against the door to keep the door open and let oxygen escape from the apartment.

Officer Zeek said, "Ed, I want to talk to you about what happened before." Defendant responded, "I don't think you're here about what happened about the prior incident. I think you want to talk to me about something else." A standoff ensued, and

5

other occupants of the building were evacuated. For 10 to 15 minutes, Officer Zeek continued talking to defendant and, at the same time, texted his superior to find out how flammable the oxygen was. Also during this time, Officer Yager continued to point his firearm at defendant. More officers arrived outside the door, and they could be heard from inside the apartment. Two other officers entered the apartment and, while defendant was distracted by one of them, the other dove and pushed the oxygen tank away from defendant. Officer Zeek grabbed defendant's hands, took away the lighter, and handcuffed him.

Defendant was escorted to a waiting patrol car. While defendant was seated in the patrol car, Officer Yager presented a consent-to-search form to defendant for a search of defendant's apartment and explained to defendant what the form was. Defendant signed the form (about 5:10 p.m.), and Officer Yager also signed it as a witness.

The consent-to-search form stated, among other things: "It has been explained to me that I need not consent and have the right to refuse to allow a search of [defendant's apartment]." The form also stated: "I fully understand my rights, as set forth above, and with that understanding in mind, consent to a search of the above-mentioned premises . . . ."

After hearing the evidence and argument, the trial court denied the motion to suppress evidence. The court referred to "the community caretaking exception, the reasonableness standard and the requirement that a peace officer has specific and articulable facts . . . ." And the court said, in part, "the record is not devoid of those specific and articulable facts . . . Officer Zeek relied upon. He clearly had information from the alleged rape victim that the defendant intended harm to himself, that he had expressed the desire to kill himself. It would be probably negligent of a peace officer to go to the door after there was a failure to respond to the prolonged knock notice to run off when it was possible that a citizen or a suspect was dying or in the process of harming himself or possibly contemplating imminent harm to themselves. So the officer had

information that was not stale in this Court's view that the defendant intended harm to himself and that employing an oxygen tank suggests very firmly the prospect of an explosion that would not only harm himself but others in proximity: citizens, neighbors, rescuers." The court also found that the consent form was voluntarily signed.

C.      *Analysis*

Here, Officer Zeek, with probable cause to believe a welfare check was necessary, entered defendant's apartment to protect defendant from imminent injury or to render aid. (*Brigham City v. Stuart, supra,* 547 U.S. at p. 403.) The entry was reasonable under the totality of circumstances. Therefore, the entry did not violate defendant's Fourth Amendment rights.

But defendant disagrees. He claims "nothing indicated there was a need to perform a 'welfare check.' " (Unnecessary capitalization & underscoring omitted.) To the contrary, Officer Zeek knew defendant and was aware of the oxygen tanks in the apartment. He heard N.L. say that defendant told her he could not live with himself after what he did and threatened to kill her and himself by blowing them up using the oxygen tanks. The silence from within the apartment supported a reasonable inference on Officer Zeek's part that he needed to get into the apartment to render aid. It would have been a dereliction of his duty not to enter under these circumstances because defendant could have already been injured, consistent with his threat, or defendant could have been preparing to ignite the oxygen to create an explosion that not only would be dangerous to defendant but also to everyone in the building, including the officers who were there to assist. At the very least, defendant may have acted on his threat to kill himself by means other than blowing himself up, so Officer Zeek had probable cause to enter the apartment for a welfare check.

Defendant supports his argument by drawing inferences from the facts in the light more favorable to his argument. For example, he argues that Officer Zeek "had no idea what was going on behind [defendant's] closed apartment door, and had only the

7

neighbors' speculation that he 'should' be home, to go by." But Officer Zeek knew defendant had threatened suicide and that oxygen tanks were in the apartment.

Defendant suggests that the facts as Officer Zeek knew them before entering the apartment allowed for "only three possible scenarios": (1) defendant was not in the apartment, (2) defendant was inside but merely decided to remain silent, and (3) defendant had already committed suicide. To the contrary, defendant's list of possible scenarios does not include all of the possibilities reasonably suggested by the known facts. Defendant could have tried to commit suicide and was lying injured in the apartment or defendant was about to blow up the oxygen tanks. Those possible scenarios justified Officer Zeek's entry.

Defendant claims that Officer Zeek could not have probable cause to enter the apartment to render aid or prevent defendant from taking injurious action because (1) Officer Zeek did not know when defendant made the suicidal statement and (2) Officer Zeek did not see defendant holding a lighter to the oxygen tank until after the officer had already entered the apartment. As to Officer Zeek's knowledge of when the suicidal statement was made, the record reflects that Officer Zeek was aware that N.L. had left defendant's apartment on the day Officer Zeek heard her say that defendant was suicidal. That we do not know the exact time of the statement does not make unreasonable Officer Zeek's inference that defendant was suicidal still. It was the same day. As to Officer Zeek's inference that defendant might use the oxygen to blow himself up, the officer heard N.L. report defendant's threat to do just that and he knew that defendant had oxygen tanks in his apartment.

Under these circumstances, the entry into defendant's apartment did not violate the Fourth Amendment because it was a reasonable to render aid or prevent injury. (*Troyer, supra,* 51 Cal.4th at p. 602 [reasonableness the ultimate touchstone of the Fourth Amendment].)

8

II

*Consent to Search*

We also conclude that defendant's consent to search was voluntary.

Defendant argues that, because the entry into his apartment violated the Fourth Amendment, his consent to search was the fruit of the illegal entry. This argument fails because the entry did not violate the Fourth Amendment.

Defendant also argues that the consent was involuntary based on the totality of the circumstances. We disagree.

A.    *Relevant Law*

"The voluntariness of consent is a question of fact to be determined from the totality of circumstances. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 227 [36 L.Ed.2d 854] (*Schneckloth*); [*People v.*] *Jenkins* [(2000)] 22 Cal.4th 900, 973.) If the validity of a consent is challenged, the prosecution must prove it was freely and voluntarily given– i.e., 'that it was [not] coerced by threats or force, or granted only in submission to a claim of lawful authority.' (*Schneckloth, supra*, at p. 233; see [*Florida v.*] *Royer* [(1983)] 460 U.S. 491, 497.)" (*People v. Boyer* (2006) 38 Cal.4th 412, 445-446.) "[K]nowledge of a right to refuse is not a prerequisite of a voluntary consent." (*Schneckloth, supra*, at p. 234.)

"Our review of the trial court's [] finding that defendant voluntarily consented to the search is limited. 'The . . . voluntariness of the consent is to be determined in the first instance by the trier of fact; and in that stage of the process, "The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings–whether express or implied–must be upheld if supported by substantial evidence." ' (*People v. James* (1977) 19 Cal.3d 99, 107.)" (*People v. Monterroso* (2004) 34 Cal.4th 743, 758.)

B.    *Analysis*

Defendant cites several circumstances leading up to defendant's consent to a search of the apartment, and he claims that those circumstances require a finding that defendant did not voluntarily consent to the search.  He notes:  (1) he had refused to open the door, (2) he did not consent to entry into the apartment, (3) several officers were present at the apartment, (4) he was tackled, (5) he was placed in handcuffs and arrested, (6) he was being held in the patrol car when he signed the consent form, and (7) Officer Yager, who had pointed his firearm at defendant during the standoff, was the one who obtained his consent to search.

These circumstances do not require a finding that defendant's consent was not voluntary.  While the events leading up to defendant's arrest and his being secured in the patrol car were certainly stressful and constituted an assertion of authority by the officers, there was no threat to defendant when he was given the consent form.  The officers acted lawfully and reasonably.  As noted, the consent form stated that defendant need not consent to the search and could refuse.  It also stated that defendant understood these rights.  It is reasonable to infer that defendant read these statements and, understanding them, signed the form giving consent.  Therefore, the trial court was justified in crediting the statements in the consent form and finding that consent was given voluntarily.

### DISPOSITION

The judgment is affirmed.

      NICHOLSON     , Acting P. J.

We concur:


      MAURO     , J.


      MURRAY     , J.