Filed 10/7/13
See Concurring and Dissenting Opinion

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NICHOLAS DEMARCO LESTER,<br><br>    Defendant and Appellant. | E055009<br><br>(Super.Ct.No. FSB1002367)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  J. David Mazurek, Judge.  Affirmed with directions.

Eric R. Larson, under appointment by the Court of Appeal for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael T. Murphy and James D. Dutton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant, Nicholas Lester, of possessing cocaine for sale (Health & Saf. Code, § 11351) and possessing marijuana for sale (Health & Saf. Code, § 11359).  The jury further found that defendant had suffered three strike priors (Pen. Code,

1

§ 667, subds. (b)-(i)), four prior convictions for which he served prison terms (Pen. Code,

§ 667.5, subd. (b))[1] and a prior drug conviction (Health & Saf. Code, § 11370.2, subd.

(a)). He was sentenced to prison for 25 years to life, plus 6 years. He appeals, claiming

his motion to suppress should have been granted. In supplemental briefing, he also

asserts that he is entitled to be resentenced to twice the term for his conviction of

possessing cocaine for sale, with a concurrent sentence of twice the term for possessing

marijuana for sale. We reject both of his contentions and affirm, while directing the trial

court to correct an error in the abstract of judgment.

The facts of this case are not relevant to the appeal.[2]

## ISSUES AND DISCUSSION

1. *Denial of Motion to Suppress*

---

[1] Only three strike priors were alleged in the information. However, the jury also made true findings as to both counts that defendant had suffered three other felony convictions. Also, the information alleged only four prison priors, but the jury made true findings, as to both counts, that defendant had suffered six prison priors. Both below and here, the parties ignore the findings as to priors that were not alleged in the information. The trial court also ignored them and sentenced defendant only for the three strike priors and the four prison priors.

[2] Counsel for appellant recently notified this court that the appeal had become moot because defendant has been "resentenced to a determinate term . . . pursuant to the discretionary sentencing provisions of Proposition 36. (Pen. Code, §1170.126.)" However, "'"[i]f an action involves a matter of continuing public interest and the issue is likely to recur, a court may exercise an inherent discretion to resolve that issue, even though an event occurring during its pendency would normally render the matter moot."'" (*Baluyut v. Superior Court* (1996) 12 Cal. 4th 826, 829, fn 2., and cases cited.) This is just such a case, and we have certified this opinion for publication. (See Cal. Rules of Court, rule 8.1105(c)(5) [addresses "conflict in the law"], (6) ["legal issue of continuing public importance"].)

At the hearing on the motion to suppress, the first officer to arrive at defendant's apartment testified that he was dispatched at 3:45 a.m. on June 10, 2010 for a disturbance between subjects which the 911 caller believed were going to have a physical fight and there were four to five female subjects near a red car who were yelling and screaming and possibly going to engage in a physical fight.[3] The 911 caller was at 1105 "F" Street, which was a two unit apartment. When the officer arrived after some delay,[4] he saw that there was no red car outside. As the officer and five others walked up to the building, defendant and the codefendant walked out of the more eastern of the two apartments, which turned out to be 1103 "F" Street and which was attached to the apartment at 1105 "F" Street, and walked towards the officers in the driveway. The officer asked the men what was going on. The codefendant said, "There is a problem with my baby mama, but it's all right now." The defendant and codefendant were detained by two of the five other officers and sat down at the curb, because it was suspected that they were involved in the disturbance that caused the 911 call. The officer spoke to the 911 caller, who told him that "a large fight had taken place next door at 1103[,]" but she did not want to say anything else.[5] The officer knocked on the door at 1103, to see if any of the females

_____

[3] The officer denied being informed before he arrived that the parties to the argument had left. Another officer who followed him into the house testified that he was aware of this, but he did not inform the first officer of this fact.

[4] The caller had given dispatch the wrong street name and after the officer and others arrived at the wrong location, she was called back and she gave the correct street.

[5] In his reply brief, defendant points to the testimony of the 911 caller that she told the officer that the people who caused the disturbance had left the location. First,

3

involved in the disturbance were there, but there was no answer.  The officer opened the door, which was not locked, and announced himself, then entered in order to find the females and ensure that there was not a physical fight and they were not injured.  He immediately detected the strong smell of marijuana.  No one was inside.  However, he saw, in plain sight, suspected marijuana and cocaine.  The officer returned to the curb, where he overheard defendant tell another officer that defendant was on parole and the apartment at 1103 was his apartment.  The officer and another re-entered the house to search due to defendant's parole status and because contraband had been seen in plain sight.

---

this witness, who initially gave the police the wrong street name for her residence and the apartment next door, was extremely confused in her testimony during the hearing on the motion to suppress, frequently giving answers that were not responsive to the questions asked, prompting defense counsel to ask her if she was having psychological problems. The testimony on which defendant relies was one such example.  In response to the question, "when [the first officer] arrived, do you remember telling him that the people who caused the disturbance had left the location?" she responded, "Yes, sir.  There's been quite a few families moved out."  The 911 caller also testified almost immediately thereafter that she did not recall telling the officer anything.  She also testified that she had "been through quite a lot of medicine."  She testified that when she called 911, she could not recall her own phone number.  The officer testified that when he spoke to the 911 caller at the scene he asked her if she had called, she said she had, he asked her what was going on, she said there had been a large fight next door, then she said she didn't want to say anything more.  Second, the trial court was tasked with making a determination about the credibility of the witnesses.  It may be inferred that it determined that any suggestion by the 911 caller that she had told the officer that the people who had caused the disturbance had left was unreliable.  Finally, even if the 911 caller so testified, she did not say how the four to five females had left, thereby leaving open the possibility that all or some of them were still inside the apartment.  Thus, even if the officer's testimony that he was unaware that the people who caused the disturbance had left was ignored and the testimony of the 911 caller and the officer who followed the first officer into the apartment that he was aware of this were given full credence, the result would not be different.

4

The trial court suggested that the facts were consistent with "there [being] an argument[,] then a fight and somebody is inside the apartment hurt . . . [and] . . . a reasonable officer would be remiss [in] not further inquiring or investigating." The trial court denied defendant's motion to suppress, saying, "[G]iven what confronted these officers, the fact that there was an indication of a problem, . . . none of the females were [*sic*] present, apparently the [red] car was gone, the [codefendant] was exiting an apartment where he had indicated there was a problem with his 'baby mama[,] but it was okay now,' I think certainly the officers would have been remiss in their duties had they not at least gone in and looked to see if somebody had been hurt[.] . . . [¶] . . . [¶] And when they went [back] in to retrieve the . . . controlled substances, suspected narcotics, and marijuana, they knew that [defendant] was on parole and subject to search . . . ."

In reviewing a ruling on a motion to suppress, we view the record in the light most favorable to the ruling and defer to the trial court's factual findings, express or implied, when supported by substantial evidence. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1157.) In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. (*Ibid*.)

Defendant contends that the trial court erred in denying his motion to suppress because the People had not carried their burden of demonstrating that the circumstances created an objectively reasonable basis for believing that a person within the house is in need of immediate aid. (*Michigan v. Fisher* (2009) 588 U.S. 45 [130 S.Ct. 546, 549]; *Brigham City v. Stuart* (2006) 547 U.S. 398, 400, 403; *People v. Troyer* (2011) 51 Cal.4th 599, 606 [*Troyer*].) "'''"There is no ready litmus test for determining whether

5

such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.""" (*Troyer*, at p. 606.) However, we must approach each case with at least some measure of pragmatism and we recognize that "the police must make split second decisions as to whether someone is in need of immediate aid . . . ." (*Ibid.*) In making his assertion, defendant merely compares the facts of this case with those of *Fisher* and *Brigham City*, wherein the entries were deemed to be reasonable. This is not particularly helpful, as the facts of those cases differed from the instant facts. Far more helpful is a discussion of cases in which the facts are closer to those here.

Such a case is *Troyer*. Therein, there was a report of shots fired at a residence and possibly an unidentified male being shot twice. (*Troyer*, *supra*, 51 Cal.4th at p. 603.) The suspects were driving a two door Chevy. (*Ibid.*) When the first officer to arrive got there, there was no such car in sight. (*Ibid.*) On the front porch, a man was administering first aid to a woman who had been shot multiple times. (*Ibid.*) Another man on the porch had a wound to the top of his head. (*Ibid.*) The woman was not able to give the officer any information. There was blood on the front door situated in such a way that it suggested that someone who was bleeding had either entered or exited the house. (*Ibid.*) The wounded man hesitated and did not answer when the officer first asked him if there was anyone inside; upon second inquiry, he hesitated and said he did not think so, and, upon third inquiry, he hesitated and said no. (*Ibid.*) The officer was afraid that the man was being untruthful or was inaccurate, the latter, due to his head wound. (*Ibid.*) The officer felt he had a responsibility to determine if an additional victim or even suspects

6

were inside the house and he could neither see inside nor hear sounds coming from inside, due to the commotion caused by arriving police and medical personnel. (*Id.* at pp. 603-604.) After announcing their presence, the officer, and others, entered the house to look for victims and suspects. (*Id*. at p. 604.) Another officer who went upstairs announced himself at the locked door of a bedroom, and, getting no response, kicked the door open. (*Ibid*.) He smelled a strong odor of marijuana and saw the drug and a scale in plain sight. (*Ibid*.) The California Supreme Court concluded, "The record amply supported an objectively reasonable belief that one or more shooting victims could be inside the house. Police dispatch stated that shots had just been fired 'at' [the house], and . . . [the officer's] observations of the blood at the scene indicated that a shooting had occurred 'mere feet [from] or within the doorway area.' Bloodstains on the door signaled that a bleeding victim had come into contact with the door, either by entering or by exiting the residence. . . . [¶] Moreover, the original dispatch report stated that a male victim had 'possibly been shot twice'—and no such victim had yet been located. . . . [T]he officer never stated that . . . he had concluded [the wounded man] must have been the man described in the dispatch report. In any event, a concern that [the wounded man] might have suffered a gunshot wound did not foreclose the reasonable possibility that the male victim described in the original dispatch was still at large. (*Causey v. City of Bay City* (8th Cir. 2005) 442 F. 3d 524, 530 [despite the plaintiffs' assurances that no one was injured, it was """"equally plausible and not unreasonable"""" for the officers to infer that the plaintiffs were concealing an injured victim . . . [Citation.] [¶] . . . [The wounded man's] inconsistent answers [about whether there was anyone inside the residence] raised

7

serious concerns about [the man's] ability to give accurate and reliable responses. [Citations.]]; *State v. Frankel* (2004) 179 N.J. 586 [847 A.2d 561, 574] ['The responding officer is not required to accept blindly the explanation for the 9-1-1 call offered by the resident answering the door . . . ']; [Citations].)" (*Troyer*, at p. 608.) The wounded man gave various answers to the officer's questions whether there was anyone inside. "[The officer] could not peek inside to verify whether [the wounded man's] final answer [i.e., 'No'] was the correct one, nor, given the chaos at the scene, could he hear whether any sounds were coming from inside the [house]. Under these circumstances, and inasmuch as [the officer] did not know who lived at the [house] or who had been the aggressor, an objectively reasonable basis existed to enter the [house] to search for additional victims. [¶] The police entry here was no less justifiable than the police reentry [in] *Tamborino v. Superior Court* [(1986)] 41 Cal. 3d 919 . . . . In *Tamborino*, police responded to a reported robbery at a particular address, and a neighbor confirmed that an injured person was inside the apartment. After receiving no response to a loud knock and announcement of his presence, the officer kicked in the door and found Tamborino, who seemed to be bleeding from the right side of his face . . . . [Citation.] The officer, unsure whether Tamborino was a suspect or a victim, brought [him] out of the apartment and handcuffed him. The officer immediately reentered the apartment, based on his concern that there might be other injured persons inside, *without even asking* Tamborino *whether anyone else was there* . . . . [Citation.] [¶] . . . [W]e explained that 'the observation of Tamborino, wounded and bleeding, coupled with the earlier report of a robbery, constituted "articulable facts" that reasonably could have led the officer to

8

decide that an immediate, brief search of the apartment was warranted to determine whether additional persons were present . . . . [The officer] had no prior information indicating that only *one* victim was involved in the robbery, and in light of the situation he confronted, *ordinary, routine common sense and a reasonable concern for human life justified him in conducting a walk-through search* truly limited in scope to determining the presence of other victims.' [Citation.]" (*Troyer,* at pp. 608-609, italics added and omitted.)

The Supreme Court also concluded that kicking in the door of an upstairs bedroom was justified, despite the absence of blood or signs of a struggle downstairs. (*Troyer*, *supra*, 51 Cal.4th at pp. 612-613.) The court reasoned, "Bloodstains . . . 'are not prerequisites to a finding of exigency.' [Citation.] [¶] Nor are signs of a struggle in the interior of a residence. [¶] . . . [¶] . . . The People's burden under the Fourth Amendment is to identify *an* objectively reasonable basis for believing that someone inside was in need of immediate aid—not to eliminate every other reasonable inference that might also have been supported by those facts. (See *State v. Mielke* (2002) 257 Wis. 2d. 876 [652 N.W. 2d. 316, 319] ['[T]he question is whether the officers would have been derelict in their duty had they acted otherwise.'].)" (*Troyer*, at pp. 612-613.)

Applying the reasoning in *Troyer* here, we note that the 911 caller believed the four to five female subjects were going to have a fight and the officer had been delayed in his arrival at the apartment. The four to five females were not present, nor was the car associated with them. However, defendant and the codefendant walked out of the apartment that was the source of the disturbance. The codefendant confirmed that there

9

had, indeed, been a "problem," and the officer was free to disbelieve his representation that everything was now all right. The 911 caller confirmed to the officer that a "large fight" had taken place at the apartment. No one answered the door at the apartment and the officer entered to find the females and make sure that none were injured. We agree with the trial court that these circumstances created a reasonable basis for the officer to believe that the females were in the apartment and in need of immediate aid.

Additionally, the items seized from defendant's apartment would have been otherwise seized pursuant to the search conditions of his parole. "Appellate review 'is confined to the correctness or incorrectness of the trial court's ruling, not the reasons for its ruling.' [Citation.]" (*People v. Baker* (2008) 164 Cal.App.4th 1152, 1156.) The fact that the trial court here did not additionally justify the search and seizure based on the inevitable discovery doctrine does not prohibit us from relying on that doctrine.[6] The

---

[6] Defendant's reliance on *People v. Hines* (1997) 15 Cal.4th 997, 1034, footnote 4, in support of his position that the People forfeited this ground is misplaced. *Hines* relied, as is pertinent here, on *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626. In *Green v. Superior Court* (1985) 40 Cal.3d 126, 137, the California Supreme Court said of *Lorenzana*, "[T]he People's new theory [on appeal there] was not supported by the record made at the first hearing and would have necessitated the taking of considerably more evidence, thus thwarting Penal Code section 1538.5's purpose of avoiding continued relitigation of admissibility questions." The California Supreme Court continued, "In still other cases the defendant had no notice of the new theory and thus no opportunity to present evidence in opposition. [Citations.] [¶] The present case does not suffer from those problems. The evidence supporting the plain view/inevitable discovery theory was fully developed by both the prosecution and defense. . . . The factual basis for the theory is fully set forth in the record, and it does not appear that any further evidence could have been introduced to suggest that [the officer] lacked probable cause to inspect and seize . . . without a warrant or consent. [¶] To close our eyes to the clear applicability of the inevitable discovery doctrine would run contrary to *the settled principle of appellate review that a correct decision of the trial court must be affirmed on appeal even if it is based on erroneous reasoning.* [Citations.] . . . [¶] When, as here, the record fully

10

prosecution's burden in this regard is to show a reasonably strong probability that the police would have discovered the evidence. (*In re Javier A*. (1984) 159 Cal.App.3d 913, 928.) The People contended in their moving papers below that defendant and the codefendant had not been detained for an improper amount of time, during which defendant admitted he was a parolee, and, as such, he was subject to the search of his home, which he admitted was 1103 "F" Street. Thus, they argued, the items would inevitably have been discovered. The officer testified that he re-entered the apartment to search it and to seize the items that had already been seen in plain view, in part, because defendant was on parole. No evidence was admitted at the hearing on the motion that the detention of defendant was unduly prolonged; the other factual matters were testified to by the officer. Therefore, a preponderance of the evidence established that the items would have been discovered during a parole search of defendant's home.

2. *Resentencing*

On October 28, 2011, defendant was sentenced to a 25-years-to-life term for his conviction of possessing cocaine for sale,[7] according to the terms of Penal Code section 667, subdivision (e)(2)(A)—the Three Strikes Law—as it then provided. On November

---

establishes another basis for affirming the trial court's ruling and there does not appear to be any further evidence that could have been introduced to defeat the theory, we hold that the failure to have urged the theory below does not preclude our reliance on it to affirm the trial court's ruling." (*Green* at pp. 138-139, italics added, fn. omitted. See also *People v. Nottoli* (2011) 199 Cal.App.4th 531, 561, fn. 14.)

[7] He also received a concurrent 25 years to life sentence for his conviction of possessing marijuana for sale.

6, 2012, when defendant's judgment was not yet final,[8] the voters of California enacted, by initiative measure, changes to several provisions of the Three Strikes Law.[9] As is pertinent here, had defendant been sentenced under the new version of the law, he would have received a sentence of double the determinate term for his conviction. (Pen. Code, § 667, subds. (e)(1) & (e)(2)(C).) Amongst the changes enacted in November, 2012 was also the creation of Penal Code section 1170.126, which provides that a prison inmate serving an indeterminate term pursuant to Penal Code section 667, subdivision (e)(2) whose sentence under the new act would not have been indeterminate, may petition the trial court that sentenced the inmate for a recall of his or her sentence. (Pen. Code, § 1170.126, subds. (a) & (b).)[10] The trial court would then resentence the inmate according to the new version of Penal Code section 667, subdivision (e), unless it determined that a resentencing would "pose an unreasonable risk of danger to public safety." (Pen. Code, § 1170.126, subd. (f).) Defendant here contends that under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), he is entitled to have his sentence automatically reduced to double the determinate term for possessing cocaine for sale. The People argue that defendant is not entitled to have the new version of Penal Code section 667, subdivision (e) retroactively

---

**8** See *In re N.D.* (2008) 167 Cal.App.4th 885, 891.

**9** Those changes took effect the following day. (Three Strikes Reform Act of 2012, Section 10 [Prop. 36, as approved by voters Ballot Pamp., Gen. Elec. (Nov. 6, 2012)].)

**10** This excludes that group of inmates whose current crimes are listed in Penal Code section 667, subdivisions (e)(2)(C)(i), (ii) & (iii) and those whose prior convictions are listed in Penal Code section 667, subdivision (e)(C)(iv). Our discussion of this issue does not include this group, as defendant is not a member of it.

applied to him and his only recourse is to petition the trial court for recall of his sentence pursuant to Penal Code section 1170.126.

In *Estrada*, *supra*, 63 Cal.2d at pages 740, 744, the California Supreme Court said of a law that reduced the punishment for a crime which became effective after the crime was committed but before the defendant's trial, conviction and sentencing, "The problem . . . is one of trying to ascertain the legislative intent—did the Legislature intend the old or new statute to apply?  Had the Legislature expressly stated which statute should apply, its determination, either way, would have been legal and constitutional." (*Estrada* at p. 744.)  Because, in the case of the statute in *Estrada,* the Legislature had not, it fell to the California Supreme Court to determine the Legislature's intent.  (*Ibid*.)  The court was guided in its effort by the following concept: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act." (*Id*. at p. 745)  The court went on to note, "[W]here the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed." (*Id*. at p. 748.)

As in *Estrada,* we must ascertain the intent of the voters in passing the amendments pertinent here to the Three Strikes Law.  (*Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Comm*. (2012) 209 Cal.App.4th 1182, 1189.)  "To determine intent, courts look first to the language of the provision, giving its words their ordinary meaning.  If that language is clear in relation to the problem at hand, there

13

is no need to go further. [Citation.] If, on the other hand, the language is ambiguous, we turn to extrinsic indicia of voter intent, particularly what the ballot pamphlet said about the initiative. [Citation.]" (*Ibid.*) Likewise, ballot pamphlet arguments have been recognized as a proper extrinsic aid. (*People v. Floyd* (2003) 31 Cal.4th 179, 187-188.)

Penal Code section 1170.126, which provides for the recalling of sentences and possible resentencing states, "The resentencing provisions under this section and related statutes are intended to apply exclusively to persons presently serving an indeterminate term of imprisonment pursuant to paragraph (2) of subdivision (e) of Section 667 . . . whose sentences under this act would not have been an indeterminate life sentence." If, as defendant argues, he, and all other inmates with Three Strike Law indeterminate terms whose judgments are not yet final, are entitled to the retroactive application of amendments to the Three Strikes Law that reduced indeterminate terms to determinate ones, and, thus, to have his sentence automatically reduced, there would be no purpose served by the existence of Penal Code section 1170.126, except for inmates whose sentences were final as of November 6, 2012. However, looking at the information conveyed to voters, that was clearly not the intent of the initiative.

The ballot pamphlet for the initiative stated, "This measure reduces prison sentences served under the three strikes law by certain third strikers whose *current offenses* are non-serious, non-violent felonies. The measure also allows resentencing of certain third strikers who are *currently serving life sentences* for specified non-serious, non-violent felonies. . . . [¶] [It] requires that an offender who has two or more prior serious or nonviolent felony convictions and whose *new offense* is a nonserious,

14

nonviolent felony receive a prison sentence that is twice the usual term for the new offense, rather than a minimum sentence of 25-years–to-life as is currently required. . . . [¶] [It] allows certain third strikers to apply to be resentenced by the courts. . . . The court would be required to resentence eligible offenders unless it determines that resentencing the offenders would pose an unreasonable risk to public safety. In determining whether an offender poses such a risk, the court could consider any evidence it determines is relevant, such as the offender's criminal history, behavior in prison, and participation in rehabilitation programs. [It] requires resentenced offenders to receive twice the usual term for their *most recent offense* instead of the sentence previously imposed. Offenders whose requests for resentencing are denied by the courts would continue to serve out their life terms as they were originally sentenced." (Ballot Pamp., Gen. Elec. (Nov. 6, 2012) (*Ballot Pamp*.) analysis by the Legislative Analyst, pp. 49-50, italics added.) In describing the correctional savings engendered by the initiative, the analysis stated, "[It] would reduce state prison costs in two ways. First, fewer inmates would be incarcerated for life sentences under the three strikes law because of the measure's provisions requiring that such sentences be applied only to third strikers whose *current offense* is serious or violent. This would reduce the sentences of some *future felony offenders*. Second, the resentencing of third strikers could result in many existing inmates receiving shorter prison sentences." (*Ibid*.) We note the distinction clearly drawn in the analysis between the *new offense* committed by *future felony offenders* who are subject to the new twice-the-base-term sentence and the *most recent offense* committed by *existing* inmates who have already been sentenced to a 25-years-to-life

15

term under the old law.  The analysis could not have been more clear in its distinction between the two and nowhere is there a reference to the possibility that some existing inmates would automatically receive a twice-the-base-term sentence merely because their judgments are not yet final.

An argument in favor of the initiative in the ballot pamphlet was the following, "Criminal justice experts and law enforcement leaders carefully crafted [it] so that truly dangerous criminals will receive no benefits whatsoever from the reform." (*Ballot Pamp.*, argument in favor of Prop. 36, p. 52)  In their opposition to this particular aspect of the initiative, the rebuttal to the argument in favor of it and the argument against it both stated that it would result in "thousands of dangerous criminals . . . get[ting] their prison sentence[s] reduced and then released from prison early." (*Ballot Pamp.*, rebuttal to argument in favor of Prop. 36, p. 52; *Ballot Pamp.*, argument against Prop. 36, p. 53.) In fact, the provisions of the initiative allowing inmates already serving Three Strike Law indeterminate sentences to be resentenced was the *only* objection to the initiative stated in the argument against it in the Ballot pamphlet.  (*Ballot Pamp.*, argument against Prop. 36, p. 53.)

Given the information supplied to the voters, we view Penal Code section 1170.126 as the functional equivalent of a saving clause.[11]  "The rule in *Estrada . . .* is not implicated where the Legislature clearly signals its intent to make the amendment prospective, by the inclusion of either an express saving clause *or its equivalent*.  In

---

[11]  In *People v. Yearwood* (2013) 213 Cal.App.4th 161, 172, 175-176, the Fifth District reached the same conclusion.

16

*Pedro T.* [(1994) 8 Cal.4th 1041, 1049], we determined the absence of an express saving clause, emphasized in *Estrada* [citation] . . . , does not end 'our quest for legislative intent.' 'Rather, what is required is that the Legislature demonstrates its intention with sufficient clarity that a reviewing court can discern and effectuate it.' [Citation.]" (*People v. Nasalga* (1996) 12 Cal.4th 784, 793, italics added, fn. omitted.) The existence of the mechanism set forth in Penal Code section 1170.126 and the analysis and arguments in the Ballot Pamphlet for the initiative persuade us that the voters did not intend that every inmate serving a Three Strike Law indeterminate term whose judgment is not yet final automatically have his or her sentence reduced to twice the determinate term for his or her conviction and completely bypass the safeguards provided by Penal Code section 1170.126.

Defendant asserts that subdivision (k) of Penal Code section 1170.126 suggests that the existence of the mechanism provided by that section was not intended to be the sole relief available to an inmate sentenced to a Three Strike Law indeterminate term. That subdivision provides, "Nothing in this section is intended to diminish or abrogate any rights or remedies otherwise available to the [inmate]." However, we do not see this as dictating that the reduction in terms for third strikers be applied retroactively—rather, we see it as a pronouncement that inmates included in the provisions of Penal Code section 1170.126 still retained their ability to file petitions for habeas corpus and various other remedies.

The People point to language in the post November 6, 2012 version of Penal Code section 667, subdivision (e) itself, which suggests that its reduced sentence provisions

17

were not intended to apply to those who are already convicted and serving Third Strike Law determinate terms. Specifically, it states that a defendant who has two or more strike priors, but the current offense is not a strike, will receive a term of twice the sentence for the convicted offense unless the "prosecution pleads and proves" a current conviction or a past conviction of specified crimes. (§ 667, subds. (e)(2)(c)(i)-(iv).) As the People correctly point out, an inmate serving a Three Strikes Law determinate term is long past the pleading and proof stage of proceedings.

Finally, we cannot ignore the possibility that, under the old law, in more than one case, a prosecutor has elected not to retry a defendant on one or more counts on which the jury hung because the defendant was to receive a 25 years to life term on another count. To have such a defendant now have his or her sentence automatically reduced, without the safeguards of 1170.126, would undermine the purpose of the initiative.

Accordingly, we decline defendant's request to reduce his sentence or to direct the trial court to impose a reduced sentence. Defendant retains his ability, under section 1170.126, to petition the trial court to recall his indeterminate sentence and to possibly resentence him to a determinate term.

## DISPOSITION

The trial court is directed to amend the abstract of judgment to omit the reference

18

to a 75-year-to-life term.  In all other respects, the judgment is affirmed.

CERTIFIED FOR PUBLICATION

RAMIREZ
P. J.

I concur:

RICHLI
J.

[People v. Lester — E055009]

HOLLENHORST, J., Concurring and Dissenting.

I respectfully concur in part and dissent in part. I concur with the majority's discussion of the denial of the motion to suppress; however, I disagree with the discussion of the Three Strikes Reform Act of 2012, Section 10 (Prop. 36, as approved by voter Ballot Pamp., Gen. Elec. (Nov. 6, 2012)) (hereafter the Reform Act or the act). The Reform Act became effective on November 7, 2012. (§§ 667, subd. (e)(2)(C), 1170.12, subd. (c)(2)(C), 1170.126.)[1]

*1. Proposition 36*

Under the Three Strikes law as it existed before the passage of the Reform Act, a defendant with two or more strike priors who is convicted of any new felony would receive a sentence of 25 years to life. (Former § 667, subd. (e)(2)(A).) As amended, section 667 provides that a defendant who has two or more strike priors is to be sentenced pursuant to paragraph 1 of section 667, subdivision (e)—i.e., as though the defendant had only one strike prior—if the current offense is not a serious or violent felony as defined in section 667.5,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated. For convenience, we will refer solely to section 667, subdivision (e) in discussing the Reform Act, omitting reference to the substantially identical section 1170.12, subdivision (c). However, the analysis applies to both sections 667 and 1170.12.

1

subdivision (c) or section 1192.7, subdivision (c), unless certain disqualifying factors are pleaded and proven.[2] (§§ 667, subds. (d)(1), (e)(2)(C).)

---

[2] Section 667, subd. (e)(2)(C) provides that second strike sentencing does not apply if the prosecution pleads and proves any of the following:

"(i) The current offense is a controlled substance charge, in which an allegation under Section 11370.4 or 11379.8 of the Health and Safety Code was admitted or found true.

"(ii) The current offense is a felony sex offense, defined in subdivision (d) of Section 261.5 or Section 262, or any felony offense that results in mandatory registration as a sex offender pursuant to subdivision (c) of Section 290 except for violations of Sections 266 and 285, paragraph (1) of subdivision (b) and subdivision (e) of Section 286, paragraph (1) of subdivision (b) and subdivision (e) of Section 288a, Section 311.11, and Section 314.

"(iii) During the commission of the current offense, the defendant used a firearm, was armed with a firearm or deadly weapon, or intended to cause great bodily injury to another person.

"(iv) The defendant suffered a prior serious and/or violent felony conviction, as defined in subdivision (d) of this section, for any of the following felonies:

"(I) A 'sexually violent offense' as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code.

"(II) Oral copulation with a child who is under 14 years of age, and who is more than 10 years younger than he or she as defined by Section 288a, sodomy with another person who is under 14 years of age and more than 10 years younger than he or she as defined by Section 286, or sexual penetration with another person who is under 14 years of age, and who is more than 10 years younger than he or she, as defined by Section 289.

"(III) A lewd or lascivious act involving a child under 14 years of age, in violation of Section 288.

"(IV) Any homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive.

"(V) Solicitation to commit murder as defined in Section 653f.

"(VI) Assault with a machine gun on a peace officer or firefighter, as defined in paragraph (3) of subdivision (d) of Section 245.

"(VII) Possession of a weapon of mass destruction, as defined in paragraph (1) of subdivision (a) of Section 11418.

"(VIII) Any serious and/or violent felony offense punishable in California by life imprisonment or death."

The Reform Act also provides a procedure that allows a person who is "presently serving" an indeterminate life sentence imposed pursuant to the Three Strikes law to petition to have his or her sentence recalled and to be sentenced as a second strike offender, if the current offense is not a serious or violent felony and the person is not otherwise disqualified.  The trial court may deny the petition even if those criteria are met, if the court determines that resentencing would pose an unreasonable risk of danger to public safety.  (§ 1170.126, subds. (a)-(g).) Accordingly, under section 1170.126, resentencing is discretionary even if the defendant meets the objective criteria (§ 1170.126, subds. (f), (g)), while sentencing under section 667, subdivision (e)(2)(C) is mandatory, if the defendant meets the objective criteria.

The majority agrees that, had defendant been sentenced under the new version of the law, he would have received a sentence of double the determinate term for his conviction of possessing cocaine for sale.  (§ 667, subds. (e)(1) & (e)(2)(C).  (Maj. opn., *ante*, at pp. 11-12.)  Defendant requests that the matter be remanded for resentencing.  Relying on *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), he contends section 667, subdivision (e)(2)(C) is an ameliorative sentencing statute which presumptively applies to all criminal judgments which were not yet final as of its effective date, and that there is nothing in the language of the Reform Act which overcomes the presumption.  The People oppose the request, arguing that the act allows persons like defendant, who are presently

3

serving an indeterminate sentence but whose sentence under the act would not have been an indeterminate sentence, to file a petition for recall in the trial court.

   *2. Section 667, subdivision (e)(2)(C) Applies to Defendants Whose Judgments Were Not Yet Final on the Effective Date of the Reform Act.*

There is a general rule of statutory construction, embodied in section 3 of the Penal Code, that "'when there is nothing to indicate a contrary intent in a statute it will be presumed that the Legislature intended the statute to operate prospectively and not retroactively.' [Citation.]" (*People v. Floyd* (2003) 31 Cal.4th 179, 184 (*Floyd*).) In *Estrada*, *supra*, 63 Cal.2d 740, the California Supreme Court created a limited exception to that presumption. In that case, the court held that where a statute has been amended to lessen the punishment for an offense and there is no clear indication of an intent to apply the amendment prospectively only, it must be presumed that the Legislature intended the mitigated punishment to apply to all judgments not yet final as of the effective date of the amended statute. (*Id.* at pp. 744-747.) The court held: "'A legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law.'" (*Id.* at 745.) From this, "[i]t is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply," including those which are not yet final. (*Ibid.*)

4

The Legislature has never abrogated the *Estrada* rule.  (See *People v. Nasalga* (1996) 12 Cal.4th 784, 792, fn. 7 (*Nasalga*).)  The rule and its continued vitality were most recently discussed by the California Supreme Court in *People v. Brown* (2012) 54 Cal.4th 314 (*Brown*).)  In *Brown*, the court reiterated that *Estrada* "is today properly understood, not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in a specific context by *articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments.*"  (*Brown*, *supra*, at p. 324, italics added.)

Despite the *Estrada* presumption, however, a court interpreting a statute that ameliorates punishment must nevertheless determine the intent of the Legislature or of the electorate in enacting the statute.  (*Floyd*, *supra*, 31 Cal.4th at p. 184.)  To determine intent, courts look first to the language of the provision, giving its words their ordinary meaning.  If that language is clear in relation to the problem at hand, there is no need to go further.  (*Ibid*.)  If the language is not clear, the tools of statutory construction must be applied, including but not limited to the *Estrada* rule.  If necessary, the court must also look to other extrinsic indicators of intention.  (*Nasalga*, *supra*, 12 Cal.4th at p. 794.)

There is no question that section 667, subdivision (e)(2)(C) is an amendment which ameliorates punishment under the Three Strikes law for those

5

defendants who meet its criteria. However, the Reform Act does not contain any explicit provision for retroactive or prospective application, and it does not explicitly state what remedy—i.e., section 667, subdivision (e)(2)(C) or section 1170.126—applies to a person in defendant's position. Consequently, we must "look for any other indications" to determine and give effect to the intent of the electorate. (*Nasalga*, *supra*, 12 Cal.4th at p. 794.)

In enacting new laws, both the Legislature and the electorate are "presumed to be aware of existing laws and judicial construction thereof." (*In re Lance W.* (1985) 37 Cal.3d 873, 890, fn. 11.) Accordingly, we presume that in enacting the Reform Act, the electorate was aware of the *Estrada* presumption that a law ameliorating punishment applies to all judgments not yet final on appeal on the effective date of the new statute. We also presume the electorate was aware that a saving clause may be employed to make it explicit that the amendment is to apply prospectively only, and that in the absence of a saving clause or another clear signal of intent to apply the amendment prospectively, the statute is presumed to apply to all nonfinal judgments. (*Nasalga*, *supra*, 12 Cal.4th at p. 793; *Estrada*, *supra*, 63 Cal.2d at p. 747.) Previous ballot initiatives have employed explicit language making an ameliorative statute prospective. For example, the California Supreme Court held that the previous Proposition 36, approved by voters on November 7, 2000, applied prospectively only, despite its ameliorative effect, because it expressly stated, "'Except as otherwise provided, the provisions of this

act shall become effective July 1, 2001, and its provisions shall be applied prospectively.' [Citations.]" (*Floyd*, *supra*, 31 Cal.4th at pp. 183-185.) The court in *Floyd* held that the plain language of this saving clause trumped any other possible interpretation of the proposition. (*Id*. at pp. 185-187.) In the Reform Act, in contrast, the absence of such language is persuasive evidence that the electorate did intend to apply section 667, subdivision (e)(2)(C) to nonfinal judgments.

This construction, moreover, is fully consistent with the expressed purposes of the Reform Act. In *Floyd*, *supra*, 31 Cal.4th at pages 187 through 188, the court found further support in the ballot arguments in support of the proposition, which stated that "'[i]f Proposition 36 passes, nonviolent drug offenders *convicted for the first or second time after 7/1/2000*, will get mandatory, court-supervised treatment instead of jail.' (Ballot Pamp., Gen. Elec. (Nov. 7, 2000) argument in favor of Prop. 36, p. 26 . . . ." (Italics added.) The ballot arguments in support of the Reform Act stated that its purpose was to ensure that "[p]recious financial and law enforcement resources" were not diverted to impose life sentences for some nonviolent offenses, while assuring that violent repeat offenders are effectively punished and not released early. The proponents stated that the act would "help stop clogging overcrowded prisons with non-violent offenders, so we have room to keep violent felons off the streets" and "help[] ensure that prisons can keep dangerous criminals behind bars for life." An additional purpose was to save taxpayers "$100 million every year" by ending wasteful spending on housing and

7

health care costs for "non-violent Three Strikes inmates."  Moreover, the act would ensure adequate punishment of nonviolent repeat offenders by doubling their state prison sentences.  The proponents pointed out that dangerous criminals were being released early because "jails are overcrowded with nonviolent offenders who pose no risk to the public."  And, the proponents stated that by passing Proposition 36, "California will retain the toughest recidivist Three Strikes law in the country but will be fairer by emphasizing proportionality in sentencing and will provide for more evenhanded application of this important law."  The proponents pointed out that "[p]eople convicted of shoplifting a pair of socks, stealing bread or baby formula don't deserve life sentences."  (Voter Information Guide, Gen. Elec. (Nov. 6, 2012) argument in favor of Prop. 36 and rebuttal to argument against Prop. 36, <http://voterguide.sos.ca.gov/propositions/36/arguments-rebuttals.htm> [as of September 9, 2013].)  Applying section 667, subdivision (e)(2)(C) to nonfinal judgments is wholly consistent with these objectives, in that doing so would enhance the monetary savings projected by the proponents and would further serve the purposes of reducing the number of nonviolent offenders in prison populations and of reserving the harshest punishment for recidivists with current convictions for serious or violent felonies, while still assuring public safety by imposing doubled prison terms on less serious repeat offenders.

For both of these reasons—the absence of any expressed intent to apply the act prospectively only and the stated intent underlying the proposition—we conclude that section 667, subdivision (e)(2)(C) applies to judgments which were not final as of its effective date.

The first published appellate decision that addresses this issue is *People v. Yearwood* (2013) 213 Cal.App.4th 161 (*Yearwood*). In *Yearwood*, as in this case, the defendant would have been entitled to second strike sentencing under the Reform Act if he had been sentenced initially after the effective date of the Reform Act. He had already been sentenced and his appeal was pending on the date the act became effective. The court held that even though the judgment was not yet final, Yearwood's only remedy was to petition for recall of his sentence and for resentencing pursuant to section 1170.126. (*Yearwood*, *supra*, at pp. 167, 168, 169.)

The court concluded, as we have, that the Reform Act does not contain a saving clause or refer to retroactive or prospective application or refer explicitly to persons in Yearwood's position. Nevertheless, the court held, section 1170.126 unambiguously applies to prisoners whose judgments were not final on the Reform Act's effective date, because those prisoners were "presently serving" an indeterminate life term under the Three Strikes law. (See § 1170.126, subd. (a).) The court further held that section 1170.126 therefore effectively operates as the functional equivalent of a saving clause and, if section 667, subdivision (e)(2)(C)

9

is read not in isolation but in the context of the entire statutory scheme, it is clear that the mandatory sentencing provision of section 667, subdivision (e)(2)(C) is intended to operate prospectively only.  (*Yearwood*, *supra*, 213 Cal.App.4th at p. 175.)

Yearwood is correct that even in the absence of an express saving clause there may be other reasons to determine that the enacting body intended the statute to apply prospectively only.  *Brown*, *supra*, 54 Cal.4th 314, provides an example. In that case, the court held that an amendment to section 4019, which increased the rate at which prisoners may earn credits for good behavior, applied prospectively only, despite the absence of express language to that effect, because the purpose of section 4019 is to provide an incentive for good behavior during incarceration. Accordingly, rather than reflecting a determination that a reduced penalty for *past* criminal conduct satisfies the legitimate ends of criminal law, section 4019 addresses "*future conduct* in a custodial setting by providing increased incentives for good behavior."  (*Brown*, *supra*, at p. 325.)  Awarding the credit retroactively, for time spent in custody before the effective date of the amendment, would not further that purpose.  Consequently, the court held, there is no logical basis for inferring that the Legislature intended the amended statute to apply retroactively, and the *Estrada* rule does not apply.  (*Id.* at p. 325 & fn. 15.)  The same is not true of the Reform Act, however.  As we discussed above, retroactive application of section 667, subdivision (e)(2)(C) is consistent with the proponents' stated

objectives of reducing prison overcrowding, reducing the resources expended on third strike offenders whose current and prior offenses are nonviolent and less serious, and enhancing public safety by ensuring that the truly dangerous repeat offenders serve indeterminate life terms less. Accordingly, there is a logical basis for inferring that the electorate intended the amendment to apply to nonfinal judgments.

Moreover, we do not agree with *Yearwood* that section 1170.126 unambiguously applies to defendants who were serving nonfinal third strike sentences on the effective date of the Reform Act. In light of the *Estrada* presumption and the absence of a saving clause in section 667, subdivision (e)(2)(C), the provision that section 1170.126, subdivision (a) applies "exclusively to persons presently serving" a third strike sentence *is* ambiguous—does it refer only to prisoners serving sentences that are final, or does it include those whose judgments are not final? It is certainly not so clear as to qualify as the functional equivalent of a saving clause. In *Nasalga*, *supra*, 12 Cal.4th 784, the California Supreme Court held that the rule of *Estrada* is "not implicated where the Legislature *clearly signals* its intent" to make an amendment prospective, "by the inclusion of either an express saving clause or its equivalent." (*Nasalga*, *supra*, at p. 793, italics added.) The court did not describe what constitutes an "equivalent" to an express saving clause. However, the court stated that in the absence of an express saving clause, the "'quest for legislative intent'" requires that "'the

11

Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.' [Citation.]" (*Ibid*.) In our opinion, the statutory language that *Yearwood* relies on does not meet that requirement because it is ambiguous. We note, too, that *Yearwood* does not cite a single case in which similarly ambiguous language was deemed to be the equivalent of a saving clause.

*Yearwood* finds support for its position in the ballot arguments in favor of the Reform Act. It points out that enhancing public safety was a key purpose of the act. (*Yearwood*, *supra*, 213 Cal.App.4th at p. 175.) The court states that giving section 667, subdivision (e)(2)(C) prospective-only application furthers that purpose by reducing the likelihood that prisoners who are currently dangerous will be released from prison under the Reform Act. In contrast with section 1170.126, section 667, subdivision (e)(2)(C) does not provide the court with discretion to impose a third strike sentence if it finds that the defendant poses an "unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).) *Yearwood* points out that several years may elapse between sentencing and finality, and a defendant who might objectively qualify for second strike sentencing under section 667, subdivision (e)(2)(C) may have shown himself or herself to pose such a risk by misconduct during postsentencing incarceration. (*Yearwood*, *supra*, at pp. 175-176.)

This is arguably a valid concern. However, it is not reflected in the ballot arguments in support of the Reform Act. We cannot say that a concern not

expressed in a ballot argument is a clear indication of voter intent, no matter how valid the concern may be. Moreover, a defendant may also be incarcerated for many months before being convicted and sentenced for a third strike offense. Such a defendant may also display a propensity for violence or other conduct while incarcerated, which indicates that he or she poses a risk to public safety. Nevertheless, any qualifying defendant convicted and sentenced after the effective date of the Reform Act is entitled to sentencing under section 667, subdivision (e)(2)(C), and the trial court has no discretion to impose a third strike sentence even if the court has concerns about the defendant's future dangerousness for any reason, including the defendant's conduct while in custody. For this reason as well, we do not find *Yearwood*'s analysis persuasive.

*3. Conclusion*

I respectfully part company with the majority's conclusion that defendant is not entitled to a reduction in his sentence or resentencing because he retains the ability, under section 1170.126, to petition the trial court to recall his indeterminate sentence and to possibly resentence him to a determinate term. I conclude that in passing the Three Strikes Reform Act of 2012, the electorate intended the mandatory sentencing provision of sections 667, subdivision (e)(2)(C) and 1170.12, subdivision (c)(2)(C) to apply to qualifying defendants whose judgments were not yet final on the effective date of the act. Hence, I

13

would vacate defendant's sentence and remand the matter to the trial court for resentencing.

HOLLENHORST
J.

14