Filed 7/15/15  P. v. Hernandez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>SEVERO TASI HERNANDEZ,<br><br>     Defendant and Appellant. | C075574<br><br>(Super. Ct. No. 12F04987) |

In this appeal, defendant Severo Tasi Hernandez challenges the magistrate's denial of his motion to suppress evidence obtained following a nonconsensual entry of his home.  The parole agents who entered the home did so because they thought a person on searchable probation lived there, but they were mistaken.  The parties agree that to justify their entry into defendant's home, the agents had to have objectively reasonable grounds to believe the probationer lived there, but the parties do not agree on the level of certainty required to meet that standard.  We need not resolve that disagreement, however, because even assuming the agents violated defendant's Fourth Amendment

1

rights in making their warrantless entry into his home, we conclude any violation of defendant's rights was neither deliberate, nor reckless, nor grossly negligent, and therefore the evidence was not subject to the exclusionary rule. Accordingly, we will affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We take the following facts from the evidence elicited at the preliminary examination, which also served as the hearing on defendant's motion to suppress.

In July 2012, Agents John Edelman and Ron Dunne -- parole agents employed by the Department of Corrections and Rehabilitation working on the California Parole Apprehension Team -- were trying to locate a parolee named Kenneth Langford. While reviewing Langford's field file, Agent Dunne noticed that Langford had noted a girlfriend by the name of Larann Tibben. (There was no evidence as to when Langford provided this information.) Agent Dunne called a telephone number that Langford had listed for Tibben, but the number was disconnected.

Agent Dunne ran Tibben's name through the Sacramento County Sheriff's Department's known person finder, which is a Web site available to law enforcement.[1] From the information on that Web site, he found that Tibben was on searchable probation and had two warrants for her arrest, one from 2010 and one from 2011. The Web site also showed her address as 6534 Meader Avenue (the Meader Avenue residence). Agent Dunne did not know if anyone had attempted to serve the warrants on Tibben at that address (or anywhere else for that matter), nor did he know if anyone had ever tried to confirm the Meader Avenue residence as Tibben's address. He did not know who put the address information for Tibben into the sheriff's Web site, where the information came from, or when the information was entered into the Web site.

---

[1]     For ease of reference, we will refer to this as the sheriff's Web site.

2

Agent Dunne wanted to talk to Tibben about Langford, so he and Agent Edelman went to the Meader Avenue residence with two Sacramento Sheriff's deputies. Just before arriving at the residence, Agent Dunne called the Sacramento County Probation Department and found that the probation department had the same address listed for Tibben as the sheriff's Web site. There was no evidence that Agent Dunne had any knowledge as to the source of the address information the probation department had or how old that information was. However, Agent Dunne testified that in his experience address information from the probation department is correct about 70 percent of the time. (Neither agent testified as to the reliability of information on the sheriff's Web site.)

Other than checking the sheriff's Web site and calling the probation department, Agent Dunne took no further steps to confirm that Tibben actually lived at the Meader Avenue residence. In particular, he did not check Department of Motor Vehicles records for her driver's license record or for vehicle registration information, and he did not check utility records for the Meader Avenue residence.

Upon arriving at the Meader Avenue residence, Agent Dunne noticed surveillance cameras out front and three cars in the driveway. No one attempted to run the license plates of the cars for vehicle registration information at that time.[2] Instead, Agent Dunne knocked on the front door, and Kao Nai Saelee answered, opening the door so that only his face and upper torso were visible. Agent Dunne told Saelee that they were there to do a probation search for Tibben. Saelee responded that Tibben did not live there and he did not know anybody by that name. Saelee told the agents he did not want them in the house, but Agent Dunne told Saelee they were going to conduct the search anyway. Agent Dunne asked Saelee to come outside and at that time he showed Saelee a picture of

---

[2]     They did so later, after they entered the residence.

Tibben, but Saelee said he had never seen her. Saelee told the agents he had one roommate who was home.

The officers then began their search of the residence. Saelee led them to the bedroom of his roommate who was at home -- defendant. The door was closed, but Saelee knocked and told defendant through the door that the agents were there to conduct a probation search. Defendant came out of the room, and Agent Edelman entered to see if Tibben was there. In plain sight, he found marijuana, a baggie containing what appeared to be a small amount of methamphetamine, and various types of ammunition. Defendant also told them he had a .40-caliber handgun behind the chair next to his bed. After defendant refused to sign a consent form for the officers to search the property, the agents froze the residence until a search warrant could be produced. After the warrant was obtained, a full search of the home was performed. The officers located numerous marijuana plants in the backyard of the home. They did not find Tibben. In fact, the person who had owned the Meader Avenue residence since 2006 testified at the hearing that he had never rented it to anyone named Larann Tibben and no one by that name ever resided there.

Ultimately, the record does not reflect how the Meader Avenue residence came to be listed as Tibben's address either on the sheriff's Web site or in the probation department's records. With respect to the probation department's records, the evidence showed that Tibben's probation was informal, so she was not under supervision by the probation department and thus had no obligation to provide the department with current contact information, but a probation officer testified that the Meader Avenue residence was listed in the department's records as Tibben's address in June 2009 and again in November 2010. The officer could not tell how the address information got into the database in 2009, but the 2010 entry had a comment on it that it was an automated entry. The probation officer said that because it was an automated entry, "it look[ed] like she reported [the address] to someone who had the capability of entering it into the system,

4

whether it be law enforcement or a court officer," and the information was then automatically transferred into the probation department's system. The officer admitted, however, that he was "not an IT person" and so he could not say what event triggered the entry in November 2010 or just where the information came from. Neither agent testified to any awareness about how old the information in the probation department's records was or where that information came from.

Agent Edelman testified that he has probably conducted over a couple of hundred parole or probation searches. While it was difficult for him to determine, he thought that in maybe a little less than half of those searches, the person who greeted him at the door said the person he was looking for did not live there. In "probably less than half" of those cases, he later found out that the person was actually there.

Defendant was charged with possession of methamphetamine for sale and possession of methamphetamine while armed with loaded, operable firearms. He filed a motion to suppress the evidence obtained as a result of the warrantless entry into his home, but the magistrate concluded the search was valid. In ruling, the magistrate first observed that the agents "checked two sources. And I grant you they may not [have] be[en] independent sources, but they're not even required by law or constitution to check more than one source as long as the source that they check is reasonably reliable and sufficient that they could base their conduct on that information. But they do more than they need to do, and they not only get it from the known persons file, but they also get it from the probation department just moments or minutes before they arrive at the house." The magistrate concluded that the information from these sources gave the agents "a basis to knock on the door and see if Ms. Tibbe[n] lived there," but the magistrate was "inclined to the view that," without more, "there [wa]s not a sufficient basis to just press forward" and enter the house. Nevertheless, the magistrate relied on the presence of surveillance cameras, Saelee's "secretive" behavior in opening the door, the presence of marijuana plants in the backyard, and the frequency with which people falsely deny that a

probationer or parolee is present[3] to conclude that the agents were reasonable in believing that Saelee was or might have been lying about Tibben living there and were therefore justified in entering the home to find out for themselves whether Tibben was there. Moreover, regarding the reliability of the sources the agents used for Tibben's supposed address, the magistrate stated that "[p]olice are not required to take information off of CJIS or known persons file, KPF, or from probation and not reasonably rely on that information, but they're not required to go further and verify the source of that information. If they were, the police would simply not be able to function in the field that way. . . . There are practical limitations to how much the police must verify information before they go forward."

After he was held to answer, defendant filed a motion to dismiss the information under Penal Code section 995, asserting that the magistrate erred in denying the motion to suppress. The superior court upheld the magistrate's decision and denied the motion to dismiss. Defendant then pled no contest and the court sentenced him to three years in prison. This timely appeal followed.

## DISCUSSION

" '[T]he "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." ' [Citation.] Thus, 'searches and seizures inside a home without a warrant are presumptively unreasonable.' [Citation.] 'Nevertheless, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions.' " (*People v. Troyer* (2011) 51 Cal.4th 599, 602.) One such exception is "where consent to the search has been given"

---

[3]     Specifically, the magistrate said it is "frequently the case" and "it happens all the time" that "when probation officers or parole agents or police go to a residence to seek to speak to or contact somebody and are told that person isn't there when the person is there."

6

(*People v. Robles* (2000) 23 Cal.4th 789, 795) -- as when a person granted probation consents to be subject to warrantless searches.  "In California, a person may validly consent in advance to warrantless searches and seizures in exchange for the opportunity to avoid serving a state prison term.  [Citations.]  Warrantless searches are justified in the probation context because they aid in deterring further offenses by the probationer and in monitoring compliance with the terms of probation."  (*Ibid.*)

"It is settled that where probation officers or law enforcement officials are justified in conducting a warrantless search of a probationer's residence, they may search a residence reasonably believed to be the probationer's."  (*People v. Palmquist* (1981) 123 Cal.App.3d 1, 11-12), disapproved on another point by *People v. Williams* (1999) 20 Cal.4th 119, 135.)  In determining whether a probation search of a particular residence was valid, "California case law is clear that the appropriate test is whether the facts known to the officers, taken as a whole, gave them *objectively reasonable grounds to believe* that [the probationer] lived at the [residence]."  (*People v. Downey* (2011) 198 Cal.App.4th 652, 661.)

Here, defendant argues that the reasonable belief standard is equivalent to probable cause, and he contends that under that heightened standard the agents did not have objectively reasonable grounds to believe that Tibben lived at the Meader Avenue residence and therefore their warrantless entry into the residence was unlawful.  The People disagree, contending "the reasonable belief standard is lesser than the probable cause standard" and "substantial evidence supports the magistrate's finding that the officers reasonably believed that the address was Tibben's" because "they verified the address with two different sources, the Sheriff's Known Person File and Sacramento County probation."  The People further argue that "the magistrate enumerated multiple factors that supported the finding that after the officers arrived at the residence and made contact with Kao Saelee at the front door, the officers reasonably believed Saelee was lying to them about Tibben and that she was actually inside the house."  The People also

argue that, regardless of the legality of the warrantless entry into the home, the evidence was properly admitted under the good faith exception to the exclusionary rule because "the officers' actions were neither deliberate, reckless, nor grossly negligent, as the officers reasonably relied on two official sources informing them that [Tibben] lived at [the home]."

We conclude that it ultimately does not matter whether the agents had objectively reasonable grounds to believe Tibben lived at the Meader Avenue residence when they made their warrantless entry to look for her, because even assuming they did not, we agree with the People that any violation of defendant's constitutional rights was neither deliberate, nor reckless, nor grossly negligent, and therefore the entry of the home does not justify application of the exclusionary rule.

Under United States Supreme Court precedent, "evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional." (*United States v. Peltier* (1975) 422 U.S. 531, 542 [45 L.Ed.2d. 374, 384].) If " 'the officer was acting as a reasonable officer would and should act in similar circumstances,' " the rule has no application. (*United States v. Leon* (1984) 468 U.S. 897, 920 [82 L.Ed.2d 677, 697].) "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." (*Herring v. United States* (2009) 555 U.S. 135, 144 [172 L.Ed.2d 496, 507].)

Here, in concluding the agents had objectively reasonable grounds to believe Tibben lived at the Meader Avenue residence, the magistrate relied on the following factors: (1) the agents obtained that address for Tibben from two sources, the sheriff's Web site and the probation department; (2) there were surveillance cameras on the

8

residence; (3) Saelee acted "secretive[ly]" when he opened the door; (4) there were marijuana plants in the backyard; and (5) people often tell probation officers, parole agents, and police that someone the officers are looking for is not there when he or she actually is there. In addition to these factors, the People rely on the presence of the three cars in the driveway, when Saelee said only he and defendant were at home, as supporting a reasonable belief that Saelee was lying about Tibben not living there and that "she was home but was evading the officers with the assistance of her roommates."

For our purposes, however, it is sufficient to focus on the first factor alone -- the information in the two databases -- in deciding whether the exclusionary rule applies here. Even assuming none of the other factors gave the agents objectively reasonable grounds to believe Tibben lived at the Meader Avenue residence, the evidence regarding the information in the databases -- particularly, the probation department's records -- leads to the conclusion that the agents did not violate defendant's Fourth Amendment rights deliberately, recklessly, or with gross negligence in entering the home without a warrant.

With respect to the information in the databases, the People contend the agents acted reasonably because "they verified the [Meader Avenue] address with two different sources, the Sheriff's Known Person File and Sacramento County probation," but that argument is flawed for two reasons. First, to the extent the People are suggesting the agents already *had* the Meader Avenue address for Tibben and verified that preexisting information against the two databases, that is not what the evidence showed. Rather, the evidence showed that Agent Dunne obtained the information that Tibben lived at the Meader Avenue residence from the sheriff's Web site and then verified *that* information against *one* additional source: probation department records. Second, to the extent the People are suggesting that these two "different" and "separate" sources were shown to be independent of each other with respect to the information the agents obtained from them, the evidence does not bear that out. There was no evidence as to where the information

9

on the sheriff's Web site came from -- either generally or with respect to Tibben in particular. For all we know on this record, the information on the sheriff's Web site could have been taken directly from the information in the probation department's records, in which case the agents would not have had two "different" and "separate" sources for Tibben's address, but only a single source -- the probation department. For this reason, we focus on that source.

One of the last questions asked of Agent Dunne was if he "ever ha[d] any instance where the information in the database checked was incorrect." Agent Dunne responded as follows: "It's probably about 70, you know -- if you're going from 100 it's probably 70/30. It's 70 where the address is right and 30 where the probation department don't take it out of the system for whatever reason, but as law enforcement that's our job and when we go in there and we check it, and if it's not we will contact the probation department and say that this is not a good address for this person and they will remove it from the system." Thus, it was Agent Dunne's testimony that the information in the probation department's records is correct probably 70 percent of the time and incorrect only 30 percent of the time.

That leads us to frame this dispositive question: Where a law enforcement officer has reason to believe, based on personal experience, that the address information for probationers maintained by the probation department is correct 70 percent of the time, is it grossly negligent (or worse) for the officer to rely on that information to enter a residence to look for that probationer, without first making an effort to corroborate that information through other sources? We conclude the answer to that question is "no." Thus, even if the agents violated defendant's Fourth Amendment rights by entering his house to conduct a probation search for Tibben, because the agents were acting based on information in a database that, in Agent Dunne's experience, is correct 70 percent of the time, the agents cannot be deemed to have engaged in deliberate, reckless, or even

10

grossly negligent conduct triggering application of the exclusionary rule. For this reason, the magistrate did not err in denying defendant's motion to suppress.

To the extent defendant challenges the agents' entry into his bedroom, as opposed to the house as a whole, no different result is justified. Defendant cites *People v. Woods* (1999) 21 Cal.4th 668 for the proposition that, in a probation search, "officers generally may only search those portions of the residence they reasonably believe the probationer has complete or joint control over." (*Id.* at p. 682.) His contention is that the agents here could not have reasonably believed Tibben had complete or joint control over the bedroom that belonged to defendant. Even if we assume defendant is correct on this point, however, the question still remains whether the agents violated defendant's Fourth Amendment rights deliberately, recklessly, or with gross negligence when they entered his room to look for Tibben.

As with the house as a whole, we conclude the answer to this question is "no." First, what argument defendant offers on this point is not persuasive, as he fails to focus on the entry into the bedroom in particular. Second, given our conclusion that it was not grossly negligent (or worse) for the agents to enter the house to look for Tibben based on the address information they obtained from a database that in their experience is correct 70 percent of the time, we see no reason why it was grossly negligent (or worse) for them to enter each part of the house where Tibben could have been -- including the bedroom occupied by defendant. Had they entered the bedroom and conducted a full-blown probation search -- e.g., opening cabinets and drawers -- without first satisfying themselves that Tibben, in fact, lived at the Meader Avenue residence, the outcome of this question -- the applicability of the exclusionary rule -- might be different. But on the facts before us, where all the agents were doing when they saw contraband in plain sight was looking for a probationer who they thought lived in the house based on information in a database that is correct 70 percent of the time, we cannot find that the agents' conduct in entering the bedroom to look for her rose to the level of culpability necessary

11

to trigger the exclusionary rule.  Thus, even looking at the entry into the bedroom in particular, the magistrate correctly denied the motion to suppress.

DISPOSITION

The judgment is affirmed.


        ROBIE        , J.


We concur:


    NICHOLSON    , Acting P. J.


    HOCH        , J.