Filed 7/20/15  P. v. Addington CA3

### NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (Sacramento)

----

| | | |
|---|---|---|
| THE PEOPLE, | | C075134 |
| Plaintiff and Respondent, | | (Super. Ct. No. 13F01885) |
| v. | | |
| COURTNEY KATHLEEN ADDINGTON, | | |
| Defendant and Appellant. | | |

A jury found defendant Courtney Kathleen Addington guilty of the first degree murder of her newborn child, assault resulting in death of a child younger than eight years old, and child abuse likely to result in great bodily harm or death (sustaining an allegation that she inflicted injury resulting in death).  After denying her motion for new trial, the trial court sentenced defendant to 25 years to life in state prison for first degree murder (staying execution of sentence on the other two counts and the enhancement).

1

On appeal, defendant argues the trial court erred in denying her motion to suppress evidence from a warrantless search of her home, claiming the emergency aid doctrine did not excuse the prolonged nature of the search. She also contends the trial court erred in admitting metadata evidence from her cell phone, and violated due process in instructing that false statements could evidence her consciousness of guilt of her crimes. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant began dating her boyfriend in June 2011 when she was 23 years old. She lived in her own house in Rosemont with two roommates who were friends of her boyfriend. In planning their future, the boyfriend had discussed his reluctance about having children (although this was not an adamant refusal); defendant would assert in jest that she was thus entitled to have as many pets as she wanted.

In November 2011, after determining from her doctor that she was eight weeks pregnant, defendant asked for a referral for an abortion. When she saw her doctor the next month, she was no longer pregnant. She never mentioned this pregnancy to her parents. It is not apparent from the record that she mentioned it to her boyfriend. The following summer, the boyfriend suspected that defendant might be pregnant because her abdomen was swelling. Defendant asserted that she had taken pregnancy tests with negative results, and attributed her condition to constipation from irritable bowel syndrome. The boyfriend kept questioning her on the subject over the next few months, his inquiries becoming more pointed and her denials becoming more heated. Defendant accused him of not trusting her, and he eventually felt he had to accept her explanation. Although her parents did not have any objection to defendant being sexually active or bearing a child out of wedlock (and had in fact been supportive of a cousin of defendant when she went through that experience), defendant also denied to them that she was

2

pregnant. She gave her parents the same explanation—irritable bowel syndrome, which had been an ongoing issue for her since she was 15.

On the morning of January 25, 2013, defendant's father called her about a lunch date. She told him that she needed to get to an emergency clinic because her bowel condition was causing her to bleed. He found her on the bedroom floor, moaning and in pain. The roommates were not home. There were bloody towels, and her sweat pants were soaked in blood. She continued to attribute this to her bowel condition. At the hospital, when the doctors were saying that she had given birth recently, her father urged her to tell the truth. Defendant, however, continued to deny giving birth, claiming she was bleeding after passing a large bowel movement. She told the boyfriend the same thing. She was bleeding so profusely from the vagina that she was rushed to surgery. In all, she required four pints of blood. A test confirmed that defendant had been pregnant. A search of her home found a dead female newborn, who was in a plastic bag drawn closed that was stuffed under the bed.

The autopsy showed that the infant was seven pounds, eight ounces and 20 inches long (consistent with a full-term infant) with the umbilical cord and placenta attached. She did not have any outward signs of trauma, or any anatomical or genetic abnormalities that could have been a cause of death. Her lungs indicated she was breathing after birth, and the body did not have any signs of decomposition consistent with death in utero.

Defendant's father reported defendant's explanation to a deputy coroner a month later. Defendant was claiming that she had hit her head in the shower and passed out; when she revived, she found that she had given birth to a stillborn child. Defendant gave the same explanation to her doctor in late January 2013, claiming that the bump on her head resulted in amnesia about the incident.

Defendant was charged with first degree murder (Pen. Code, § 187, subd. (a)), assault on a child younger than eight years old with great bodily injury causing death (*id*.,

3

§ 273ab), and abusing or endangering the health of a child (*id*., § 273a, subd. (a)) with an enhancement allegation that corporal injury to the child caused its death (*id*., § 12022.95).

At trial, defense counsel stressed the existence of reasonable doubt that defendant suffocated a living newborn.

## DISCUSSION

### 1.0     The Emergency Aid Doctrine Justified the Warrantless Search of the Home

It is not clear whether defendant is challenging the pretrial motion to suppress, the denial of her motion for new trial renewing the issue, or both. As a result, we draw our facts both from the pretrial representations of the parties and the testimony at trial.

When defendant's father took her to the hospital for excessive bleeding, the doctor examining her immediately informed a police officer out of earshot that she believed defendant had just given birth to a full-term baby (despite defendant's denials), which needed to be found immediately. The officer notified the sheriff's department because defendant lived in the county. Without obtaining defendant's consent, two deputies went to her home to look for the infant. They began their search at 6:15 p.m. Their initial cursory survey of the home, which lasted about 15 minutes, looked for the baby in obvious locations in plain sight. In the bedroom, they noticed a garbage bag on the floor with a drop of blood on it, the blood and vomit in the bathroom, and bloody towels in the washer. They also checked the garbage cans in the backyard.

One deputy left defendant's home at about 6:30 p.m. to go back to the hospital to speak with defendant. When asked to consent to a more complete search of her home, defendant initially declined, but then consented to a search with her father present. In the meantime, the deputy who remained at the home renewed the search because he thought the baby was possibly still alive, and decided to focus on the master bedroom. He realized he had not looked under the bed, where he found the infant's bagged body. He

4

called the deputy at the hospital at about 7:45 p.m. to advise him.[1] He immediately stopped searching the home at that point.

The trial court in both rulings—the pretrial motion to suppress and the new trial motion—found that there was an exigent need to determine whether there was a living baby at the scene. This did not abate until the sheriff's deputy found the baby's body.

The prosecution bears the burden of establishing the exigent circumstances that justify a warrantless search. (*People v. Troyer* (2011) 51 Cal.4th 599, 605.) In order to determine if the justification of emergency aid applies, a trial court must find that the circumstances known to an officer objectively warranted a belief that it was necessary to make a warrantless entry of a home to render aid to a person who is either seriously injured or at risk of injury;[2] we review whether substantial evidence supports the trial court's factual findings, and then decide the legal issue de novo, which is a fact-specific conclusion lacking qualifiable criteria. (*Troyer*, at p. 605; *Brigham City v. Stuart* (2006) 547 U.S. 398, 400, 403-404 [164 L.Ed.2d 650]; *Mincey v. Arizona* (1978) 437 U.S. 385, 392-393 [57 L.Ed.2d 290] [noting that four-day search after all occupants located is beyond the pale of "legitimate concerns that justify an emergency search"].)

Asserting that the initial search was "thorough," defendant contends justification for the initial warrantless search expired at its conclusion. She does not provide any authority for constraining exigency in this fashion. Evidence in plain sight confirmed a reasonable suspicion that the home was the site in which defendant gave birth. It was also reasonable to believe the infant could still have been alive. It was consequently

---

[1] The report of the hospital deputy indicated the other deputy had called from the home to ask if defendant had yet consented. In its ruling on the motion for a new trial, the court resolved the conflict in favor of the other deputy's report.

[2] Defendant is thus incorrect that an officer's subjective motivation plays any role in the analysis.

imperative for the remaining deputy to renew his efforts to find the baby after the first unsuccessful search, realizing on reflection that he had failed to look under the bed (a plausible concealed location for the infant).  This case is akin to *People v. Panah* (2005) 35 Cal.4th 395, which upheld a second warrantless search of a home for a missing child on the day after what *Panah* describes as "a cursory search of obvious places where a child might be found" (*id*. at p. 466), where the police did not have any definitive evidence that the child was already dead; and the child's continued absence and bloodstain evidence in the defendant's car "heightened the exigent circumstances" justifying the second search (*id.* at p. 468).  The deputy's reentry of the home in the present case was therefore justified.

**2.0     The Trial Court Properly Admitted Metadata Evidence from the Phone**

If it needs explanation at this late date, Internet Web sites download text files on a user's device (so-called "cookies") either to facilitate use of the Web site or to track the user's habits.  Before a police expert testified, defense counsel objected to his testimony regarding cookies that he had extracted from defendant's smart phone.  Unlike a search history, which has specific dates and times associated with accessing a particular Web site (to which counsel did not have any objection), cookies are undated and do not have any particular expiration date.  Counsel argued this limited the probative value of the cookie evidence in comparison with the prejudicial value of the nature of some of the Web sites visited.  The court found that the nature of the accessed Web sites was directly relevant to the issue of whether defendant was aware of the pregnancy at issue, and the issue of whether she accessed these Web sites during her prior pregnancy was simply a question of weight.  The expert then testified that he retrieved over 1,000 cookies from accessed Web sites (the dates of which could not be determined, and could be associated with defendant's previous pregnancy).  These included Web sites referencing pregnancy health issues, abortion (including methods for self-induced abortions), and miscarriage.

6

Defendant argues the absence of dates made the cookie evidence irrelevant (and thus inadmissible) or of minimal probative value that was outweighed by the prejudice that feelings on abortion can elicit.  (In response to an argument in the People's brief, she eschews any claim that the evidence was not properly authenticated.)

We review admissibility rulings for an abuse of discretion.  (*People v. Duff* (2014) 58 Cal.4th 527, 558.)

Taking a step backward from our breathlessly digital age, had a search revealed that defendant had books in her home on these subjects, this would not *necessarily* prove she consulted with them during her second pregnancy.  But evidence did not *forestall* that circumstance either (such as the books being sealed in a dusty attic box).  As in a case the People bring to our attention, an innocent explanation for incriminating evidence does not drain it of probative value.  (*People v. Hartley* (1961) 197 Cal.App.2d 111, 116-117 [presence of semen stains in underwear seized from defendants not without probative value, even absent evidence that they were wearing them on day of rape or the possibility of nonsexual excretion].)  Nor, in a case involving the tragic disposal of a healthy newborn, does it seem likely that evidence of consultation with abortion methods would induce a jury to convict defendant for reasons unrelated to the evidence.  (See *People v. Doolin* (2009) 45 Cal.4th 390, 439; cf. *People v. Scott* (2015) 61 Cal.4th 363, 396-397 [severance motion; no prejudice in joining burglary counts to charge of sexual assault and murder of elderly woman].)  It was therefore reasonable to admit the evidence and allow the jury to assess whether it reflected consciousness of pregnancy.

In any event, the expert also testified that defendant's search history included sites with pregnancy-related information (including signs of labor) just days before the birth of the victim.  As a result, any error in admitting the cookie evidence was manifestly harmless.

7

**3.0 The Pattern Instruction on Consciousness of Guilt Does Not Permit an Irrational Inference**

"The inference of consciousness of guilt from willful falsehood or fabrication . . . is one supported by common sense, which many jurors are likely to indulge even without an instruction." (*People v. Holloway* (2004) 33 Cal.4th 96, 142.) The trial court charged the jury with the present pattern instruction on this principle, which provides that making a false or misleading statement after the commission of a crime "may show [a defendant] was aware of her guilt of the crime and you may consider it in determining her guilt." (CALCRIM No. 362.)

Resurrecting a long rejected argument that the phrase "consciousness of guilt" (the title of the prior pattern instruction) allowed a jury to draw an irrational inference that subsequent falsehoods or fabrications establish mental elements of first degree murder at the time of the offense, defendant asserts that the new wording permitting an inference "she was aware of her guilt *of the crime*" in fact now allows the jury impermissibly to infer mental elements of murder at the time of the offense that do not flow rationally from evasive behavior after the crime's commission. (CALCRIM No. 362, italics added; *People v. Watkins* (2012) 55 Cal.4th 999, 1028; *People v. Crandell* (1988) 46 Cal.3d 833, 871 [both cases holding that the phrase is reasonably interpreted only as permitting an inference that a defendant is conscious of some *wrongdoing*, not the specific mental *elements* of the particular offense at issue].)

The Supreme Court has indicated, in *People v. Howard* (2008) 42 Cal.4th 1000, that it gives short shrift to this claim. "[D]efendant contends that consciousness of guilt instructions like CALJIC No. 2.52 (and see . . . *CALCRIM No. 362*) invite the jury to draw irrational and impermissible inferences with regard to a defendant's state of mind at the time the offense was committed. We have repeatedly rejected this argument [citation], and do so here." (*Howard*, at p. 1021, italics added.) Although the instruction at issue in *Howard* involved drawing an inference of guilt from *flight*, the italicized

8

citation to the current falsehood instruction (CALCRIM No. 362) is a signal that the Supreme Court does not discern any infirmity in it, either. As a result, we do not need to belabor the point; we believe a reasonable juror still would interpret the new jury instruction language as allowing an inference of awareness of having committed *a* crime, not any particular crime or mental element.

## 4.0   Cumulative Error

Defendant contends the cumulative effect of the errors she has identified resulted in the deprivation of due process at trial. (*People v. Hill* (1998) 17 Cal.4th 800, 845.) As we have not found any error (beyond the one we posited arguendo as being manifestly harmless—metadata), a synergistic effect is not present.

### DISPOSITION

The judgment is affirmed.

                                                       BUTZ             , J.

We concur:

_____BLEASE_____, Acting P. J.

_____HOCH_____, J.